[No. S083899. Jan. 20, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD LONNIE BOOKER, Defendant and Appellant.

144

146

**COUNSEL**

Jonathan P. Milberg, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Adrianne S. Denault and Elizabeth A. Hartwig, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MORENO, J.**—A jury convicted defendant Richard Lonnie Booker of the first degree murders of Tricia Powalka, Amanda Elliot, and Corina Gandara. (Pen. Code, § 187, subd. (a).)[1] It also convicted him of arson (§ 451, subd. (b)) and the attempted murder of Eric S. (§§ 187, 664). It found true special circumstance allegations of multiple murder as to each count of murder (§ 190.2, subd. (a)(3)) and that Corina was murdered during the commission or attempted commission of a rape (§ 190.2, former subd. (a)(17)(iii), now (a)(17)(C)) and a lewd act by force on a child under 14 (§ 190.2, former subd. (a)(17)(v), now (a)(17)(E)).[2] The jury further found that defendant had personally used a handgun and a knife in the commission of these offenses. (§§ 1192.7, subd. (c)(8), (23), 12022, subd. (b), 12022.5, subd. (a).) The jury returned a verdict of death as to each of the victims. The trial court denied the automatic application to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death for the three murders and to life with the possibility of parole and determinate prison terms for the remaining counts and allegations.

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution evidence*

On August 9, 1995, 19-year-old Tricia Powalka lived in an apartment in the City of Riverside with her six-month-old son, Eric S. Eric's cousins, 15-year-old Amanda Elliot and 12-year-old Corina Gandara, sometimes visited them and babysat Eric.[3] Amanda's close friend, 21-year-old Deverick Maddox, twice previously had visited the apartment to socialize with the young women. Although Maddox had spent the night at Powalka's apartment on a previous occasion, he denied having a sexual interest in any of the young women.

During the evening of August 9, Maddox visited Powalka's apartment while she was at work; Amanda, Corina, and Eric were there. Amanda suggested Maddox invite a friend over, so he telephoned defendant and

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The jury found not true the allegation that Powalka was murdered during the commission or attempted commission of a rape.

[3] We refer to various related persons by their first names, not from disrespect, but to avoid confusion.

invited him over. Maddox left the apartment to meet defendant, who had turned 18 a month before; on the way back, they stopped at a nearby liquor store, purchased two bottles of fortified wine, and returned to the apartment. Powalka arrived at the apartment, and then she, Maddox, and defendant went to a store and bought some more liquor. The two men and three young women spent the evening drinking, talking, dancing, playing dominos, listening to music, and watching a movie; a neighbor was also present for part of the evening. At one point, Powalka retrieved a gun from the bedroom, showed it to the others, and let defendant handle it. Neighbors heard talking, laughter, and music until as late as 3:00 a.m.

At some point, Powalka went to her bedroom to go to sleep. Maddox and defendant fell asleep on the couch in the living room, and Amanda and Corina slept on the floor. Maddox awoke during the night and noticed Amanda was now on the couch and defendant was on the floor.

In the early morning, Maddox was awakened by Amanda screaming. Defendant was standing looking towards the hallway. Amanda entered from the hallway holding her neck, then dropped to her knees. The other females were not in the living room. Defendant was holding a knife and a gun in his hands, which were covered with blood; he was not wearing shoes and his socks also were covered in blood. Amanda told Maddox she had been heading towards the bathroom when defendant "sliced" her. Maddox asked defendant if there had been an accident, and he responded he did it "on purpose," repeatedly apologized, and said he "killed them." When Maddox told defendant they had to call the police, defendant said he was not going to go to jail.

Maddox walked down the hallway and saw Corina's body in a puddle of blood in the bathroom. Powalka's bloodstained legs were visible in the bedroom. Maddox started to leave the apartment, but defendant thrust the gun at him and said, "Shoot me. I rather you kill me than to go to jail, if you tell them."

Maddox went home. About 6:00 a.m. on August 10, 1995, a coworker of Maddox's father arrived at the Maddox household to drive Maddox's father to work. While there, the coworker saw Maddox enter the house; there was no blood on him. Later that day, Maddox washed his clothes.

At some point in the morning, defendant telephoned Maddox. Defendant told Maddox that while talking to Corina he dropped his knife near her and she accused him of trying to cut her. Defendant said Corina went to tell Powalka, so he followed her.

About 7:30 a.m., the maintenance supervisor for Powalka's apartment complex received a telephonic page indicating there was a fire in her unit.

Receiving no response to his knocks on Powalka's door, the supervisor opened the door with his master key and discovered Amanda's body in the living room and Powalka's body in the bedroom of the smoke-filled apartment. Powalka was wearing no clothes except a pair of shorts, and her panties were rolled around her left knee. On the stove was a large deposit of ashes. Firefighters arrived and rescued Eric from his playpen in the bedroom. A firefighter started to drag Powalka's body from the apartment, but stopped after realizing that she already was dead. A chest of drawers was blocking the bathroom door. Firefighters moved the chest, looked into the bathroom, and saw Corina's body. Corina's shorts and panties, like Powalka's, had been rolled down around her left knee. Corina's legs were open and there were bloodstains on her thighs consistent with the shape of handprints.

Fire investigator Timothy Rise determined the fire had been deliberately started by placing a nylon bag full of clothes on the stove's hot burners. There was charring on the kitchen cabinets, the overhead light fixtures, and the stove's exhaust vent. In Rise's opinion, the amount of smoke in the apartment would have been lethal.

Powalka's neighbors told law enforcement personnel that Maddox was one of the male visitors from the night before. Detectives located Maddox, transported him to the police station, and interviewed him there. After initially denying any involvement, Maddox identified defendant as the other visitor.

After locating defendant and transporting him to the police station that night, Riverside Police Detective Ron Sanfilippo advised him of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] to remain silent and have counsel present during questioning. Defendant, who had a cut on one of his hands, initially denied involvement in the killings. Defendant told the officers his memory of the events was incomplete and confusing because he had been drinking heavily that night. Defendant acknowledged Maddox had introduced him to the young women and they were "kicking back" and having a party at the apartment. Defendant initially claimed he had left about 3:00 a.m., but revised his story after Sanfilippo told him that they had already spoken to Maddox.

Defendant then claimed he was absentmindedly playing with his knife when Corina accidentally bumped into it. Corina asked defendant why he was trying to stab her and tried to grab the knife, so he "hit" (that is, stabbed) her. Defendant inconsistently claimed he threw Corina into the bathroom and that she ran in on her own accord. Defendant said he locked the bathroom door, but denied blocking it with the chest of drawers.

Defendant provided various explanations for how he killed Powalka. Defendant initially claimed Powalka threatened to shoot him, so he struck her in the neck. Defendant then claimed that when he exited the bathroom Powalka put the gun to his head, so he stabbed her at least twice. Defendant also claimed Powalka tried to shoot him when he threw Corina into the bathroom, so he struck Powalka. At some point, defendant knocked the gun out of Powalka's hand and picked it up. As Powalka was lying on the ground, defendant removed her shorts.

Defendant admitted that he returned to the bathroom and told Corina to take her shorts off, and that he "kind of helped" her while she was lying on the floor. Defendant admitted he was drunk and did not intend to "make it" with Corina; he alternatively admitted he "might of touched" her "down there," but also said he only "looked" at her "there." Defendant recalled striking Corina, perhaps more than once, as she lay on the bathroom floor.

With respect to Amanda, defendant claimed she charged him, so he stabbed her two or three times in the neck and then shot her as she lay on the ground.

Defendant denied deliberately trying to set the apartment on fire, but admitted he may have put a laundry bag on top of the stove and turned on the burner before he left. Defendant denied knowing that Eric was in the apartment that evening, but recalled hearing a baby cry at some point. Defendant claimed that, before he left the apartment, he picked up the telephone to call the police, but then changed his mind and went home and slept.

Defendant described the weapons as being a .22-caliber Beretta handgun and a knife that was actually two steak knives that he had taped together. Defendant showed Sanfilippo where he had hidden the handgun near Powalka's apartment. Later, ballistic tests indicated that an ammunition casing recovered from the apartment was "probably" fired by the recovered handgun. Defendant claimed he threw the knife into a garbage can, and it was never recovered. Maddox testified he regularly saw defendant carrying a knife, and one of defendant's friends also testified he had seen defendant with a knife similar to the one used in the killings. Police officers later searched defendant's room and found two steak knives similarly taped together.

While in jail, defendant told deputies that he should get the death penalty and be executed "for what he had done," expressed concerned for his own safety in custody, and said he wanted to talk to a priest or a pastor because he wanted to die or kill himself. Defendant was placed in a safety cell because he told a doctor he wanted to kill himself.

In August 1995, Robert DiTraglia, M.D., a forensic pathologist, performed autopsies on the victims and concluded all of them had bled to death. Neither fire nor smoke contributed to their deaths.

Corina suffered multiple "sharp force injuries" (that is, stab and cut wounds) to the neck and bled to death because her right carotid artery and jugular vein were severed. Corina bore no signs of genital trauma. Two criminologists compared hairs obtained by combing Corina's pubic region with samples provided by defendant and Maddox; the criminologists concluded the recovered hairs were inconsistent with defendant's samples but consistent with Maddox's and her own. An analysis of vaginal swabs and Corina's clothing did not reveal the presence of semen.

Powalka was stabbed 54 times and had at least 52 cut wounds. Powalka's right carotid artery was severed in one location and almost severed in another; the right jugular vein also had multiple sharp-force injuries. Powalka bore no signs of genital trauma. A vaginal smear slide collected from Powalka indicated the presence of spermatozoa, but there was insufficient material to perform further analysis.

Amanda was stabbed six times and had multiple cut wounds. Her right carotid artery was partially severed. Amanda also was shot: the bullet entered behind her left ear, pierced her lungs, and lodged there. The gunshot wound would have been independently fatal. Amanda also had multiple stab and cut wounds, consistent with being defensive wounds, that were caused by a serrated knife blade.

### 2. Defense evidence

Defendant presented no evidence, but impeached Maddox with convictions for receiving stolen property and discharging a firearm from a car.

### B. Penalty Phase

#### 1. Prosecution evidence

##### a. Defendant's uncharged violent criminal conduct

On March 22, 1994, defendant stabbed his uncle, Robin Stewart. Stewart, who was much larger than defendant, had been bullying him for months. On that day, Stewart shoved defendant against a wall and then threw him out the front door. Stewart insulted defendant and dared him to come back. Defendant came back, stabbed Stewart in the stomach, and ran away. Stewart went

to the hospital for treatment. Although Stewart testified defendant was justified in stabbing him, he had told the police defendant stabbed him for no reason.

During the summer of 1994, defendant's former neighbor, Maricely Ascencio, her husband, and her brother were arguing with one of defendant's relatives. Defendant joined in the argument and threatened to kill Ascencio and her family if they were "messing with his brother," so she reported the incident to the police. Although defendant was unarmed during the argument, Ascencio twice saw defendant with two taped-together knives that he repeatedly threw against the ground.

Ascencio's brother recalled another incident where he saw defendant chasing an individual down the street while trying to hit him with a stick.

A few months before the murders, defendant and four other men were arguing near a high school. The four other men started fighting. Defendant pulled out a knife, but did not engage anyone in combat.

b. *Victim impact evidence*

Powalka had, in addition to her son Eric, a daughter, Brianna, who was two years old when Powalka was murdered. Powalka's mother, Frankie Sanderson, described Powalka as "[f]eisty, a lot of fun, very outspoken, [and] just a good person." Despite her extensive injuries, Powalka had an open-casket funeral. Powalka was cremated because her mother believed she "didn't like bugs" and would not have wanted to be in the ground. It was very difficult for Sanderson to view the autopsy photographs, sort through Powalka's belongings, make the funeral arrangements, apply to be the guardian for her two children, and endure the holidays, her birthday, and the anniversary of her death. Since Powalka's death, Eric and Brianna had not lived together. Sanderson believed Powalka's death had a negative effect on her health, and accelerated her own mother's death. Sanderson missed Powalka terribly. Linda Baker, Powalka's sister, described her as a happy, fun, outgoing person who was a great mother. Baker started raising Brianna.

Esther Elliot-Martin, Amanda's mother and Corina's aunt, described her daughter as beautiful, intelligent, thoughtful, caring, helpful; good at writing, music, video games, and making people laugh; and as someone who loved children, especially Eric. Amanda had written a poem about her brother, which Elliot-Martin read to the jury. Elliot-Martin missed Amanda, especially on birthdays, Mother's Day, and Christmas; whenever she heard the song "Mandy," which was Amanda's nickname, Elliot-Martin cried.

Corina was the only child of Nora Gandara, who described her daughter as her best friend and a warm and caring person. Richard Gandara, Nora's

husband and Corina's stepfather, described Corina as easy to raise, and as a "straight-A" student who loved school, played clarinet, composed music, drew, and wrote stories. Corina also loved Eric. Nora and Richard stayed involved with Corina's school because her murder was so hard on her friends. Because of Corina's death, Nora attempted to commit suicide and had been in a mental institution twice; due to her condition, Richard had to take care of her. Nora had not been able to find work, Richard was unable to concentrate at work and had changed jobs three times, and they were struggling to keep their marriage together.

Ricardo Gandara, Amanda and Corina's grandfather, described their family as extremely close, and said it was "hell on earth" having to deal with his daughters' loss of their children. The holidays were the worst.

The jury viewed videotapes depicting photographs of each of the young women.

### 2. *Defense evidence*

Defendant's mother, Natalie Booker, was born with brain damage due to complications during her birth. Defendant's grandmother, Mary Booker-Johnson, was Natalie's caretaker, as she was unable to live independently, handle money, make rational decisions, or exercise good judgment. Natalie could write her name but could not read. Natalie, who was 19 years old when she gave birth to defendant, did not know how to take care of her son or even how to clean a house. Defendant and Natalie lived with Booker-Johnson for almost all of his childhood.

In school, defendant had problems with reading comprehension and mathematics and was placed in a special education program in the second or third grade.

In 1991, Natalie was hit by a car and had been comatose in a convalescent home ever since. Defendant, who was 12 or 13 at the time of the accident, was devastated, struggled in school, and was not quite the same since the accident.

Booker-Johnson described defendant as a good grandson who had been "a right hand" to her. Booker-Johnson provided examples of defendant's helpfulness, and testified that she had always known him to be kind and caring. She loved defendant very much.

Defendant had one son, who was born in 1995 shortly after the murders.

## II. Discussion

### A. *Pretrial Issues*

#### 1. *Failure to initially swear in grand jurors*

The trial court did not swear in the grand jury until midway through its proceedings, and defendant contends this omission constituted a "fundamental jurisdictional error" that compels reversal.[4] These are the relevant facts:

Defendant's case was initiated by way of an indictment rather than a complaint. (See § 682.) On February 28, 1996, the trial court selected the jurors for a criminal grand jury, including a foreperson, from a pool of potential petit jurors.

The person selected as the grand jury foreperson admonished the rest of the potential grand jurors to step down if they could not act impartially. The prosecutor made his opening statement. Sanfilippo then testified and played a portion of the audiotape recording of defendant's confession.

At this point, the trial court realized that the assembled jurors had not been sworn in, so it administered the oath for grand jurors.[5] The grand jury then finished listening to the audiotape. Sanfilippo continued to testify.

---

[4] Defendant here, and in a number of other claims, urges that the error or misconduct he is asserting infringed various rights guaranteed by the federal and state Constitutions. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies here: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

[5] "The following oath shall be taken by each member of the grand jury: 'I do solemnly swear (affirm) that I will support the Constitution of the United States and of the State of California, and all laws made pursuant to and in conformity therewith, will diligently inquire into, and true presentment make, of all public offenses against the people of this state, committed or triable within this county, of which the grand jury shall have or can obtain legal evidence. Further, I will not disclose any evidence brought before the grand jury, nor anything which I or any other grand juror may say, nor the manner in which I or any other grand juror may have voted on any matter before the grand jury. I will keep the charge that will be given to me by the court.' " (§ 911.)

Sanfilippo's partner also testified; during his testimony several photographs were introduced into evidence. The prosecutor then made his closing argument and instructed the grand jury. The grand jury returned the indictment at issue.

On April 26, 1996, defendant moved pursuant to section 995 to set aside the indictment on the ground, among others, that some evidence was presented to the grand jury before it was sworn in.[6] Following a hearing, the trial court denied the motion.

Defendant filed a petition for writ of mandate in the Court of Appeal, which denied it without comment. (*Booker v. Superior Court* (Sept. 10, 1996, E018917) [nonpub. order].)

The Attorney General concedes the trial court administered the oath to the grand jurors after they had heard some testimony, but contends defendant suffered no prejudice from this belated swearing-in of the grand jurors and thus is not entitled to relief.

■ The Attorney General is correct. Under federal and state law, irregularities in grand jury proceedings generally are reviewed for prejudice. (See, e.g., *Bank of Nova Scotia v. United States* (1988) 487 U.S. 250, 254–257 [101 L.Ed.2d 228, 108 S.Ct. 2369] [citing Fed. Rules Crim.Proc., rule 52(a), 18 U.S.C.]; *People v. Jablonski* (2006) 37 Cal.4th 774, 800 [38 Cal.Rptr.3d 98, 126 P.3d 938] [citing *Bank of Nova Scotia*] (*Jablonski*).) Isolated exceptions to this general rule, not applicable to defendant's case, have included cases involving discrimination in the composition of the grand jury based on the grand jurors' race (*Vasquez v. Hillery* (1986) 474 U.S. 254 [88 L.Ed.2d 598, 106 S.Ct. 617]) or gender (see *Ballard v. United States* (1946) 329 U.S. 187 [91 L.Ed. 181, 67 S.Ct. 261]).

Citing *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941] (*Pompa-Ortiz*), defendant contends the challenge to the indictment that he filed prior to the start of his trial now relieves him of the burden of demonstrating on appeal the prejudice he suffered. Not so. In *Pompa-Ortiz*, we affirmed the defendant's conviction despite irregularities in his preliminary examination and ruled that, as to pretrial challenges to irregularities during the preliminary examination, a defendant need not demonstrate prejudice to obtain relief, but must as to posttrial challenges. (*Id.* at p. 529.) We have since extended the rule articulated in *Pompa-Ortiz* to include irregularities during grand jury proceedings. (See, e.g., *Jablonski, supra*, 37 Cal.4th at pp. 800–801.)

---

[6] Section 995, subdivision (a)(1)(A), provides that an indictment shall be set aside "[w]here it is not found, endorsed, and presented as prescribed in this code."

Defendant is correct that *Pompa-Ortiz* did not require a showing of prejudice during a pretrial challenge to irregularities in the preliminary examination, but nothing in *Pompa-Ortiz* suggests that standard of review applies to a posttrial challenge if the defendant asserted the challenge pretrial. In *Jablonski*, notwithstanding the defendant's having challenged alleged irregularities during the grand jury proceedings in a section 995 motion, we rejected the claim as presented on appeal because he failed to demonstrate prejudice. (*Jablonski, supra*, 37 Cal.4th at pp. 800–801.) As *Pompa-Ortiz* and *Jablonski* demonstrate, the need for a showing of prejudice depends on the stage of the proceedings at which a defendant raises the claim in a reviewing court, and not simply on whether he or she had raised the claim prior to trial. That defendant here, unlike the defendant in *Jablonski*, filed a pretrial writ petition does not alter the analysis as to why no showing of prejudice is required for pretrial challenges to grand jury proceedings but is required for posttrial challenges.

Defendant also cites *Serna v. Superior Court* (1985) 40 Cal.3d 239 [219 Cal.Rptr. 420, 707 P.2d 793] in support of the contention that pretrial exhaustion obviates the need for a posttrial showing of prejudice. In *Serna*, we granted a pretrial petition for writ of mandate directing the superior court to dismiss a case on speedy trial grounds. We did so without requiring a showing of prejudice. In the course of our analysis, we observed, "it is not unreasonable to require a felony defendant who does not *seek* or obtain pretrial relief to demonstrate actual prejudice when reversal of a judgment is sought on this ground on appeal." (*Id.* at p. 263, italics added; see also *People v. Stewart* (2004) 33 Cal.4th 425, 461 [15 Cal.Rptr.3d 656, 93 P.3d 271] (*Stewart*).)[7] Seizing on the italicized language, defendant emphasizes that he did in fact *seek* relief prior to this appeal, and contends he ought therefore to be excused from the requirement to demonstrate prejudice. We are not persuaded. *Serna* and *Stewart* are consistent with *Pompa-Ortiz*'s rule that whether a showing of prejudice is required depends on the stage of the proceedings at which the claim is raised in the reviewing court. To the extent defendant reads *Serna* or *Stewart* as implying a different showing of prejudice is required for posttrial challenges based on whether there was also a pretrial challenge, he is mistaken.

Thus, because this is a posttrial challenge to the grand jury proceedings, any irregularity in the proceedings requires reversal only if defendant has

---

[7] As defendant notes, *Stewart* also does state, "As defendant concedes, he presented none of his current challenges . . . by way of a pretrial writ petition." (*Stewart, supra*, 33 Cal.4th at p. 462.) From this, defendant infers a different standard would apply if there had been a pretrial writ. Nothing in *Stewart*'s analysis, however, indicates the court would have reached a different result had the defendant raised the challenges prior to trial.

been prejudiced. Assuming for the sake of argument that the irregularity violated the federal Constitution, defendant is entitled to relief unless the prosecution can show beyond a reasonable doubt that the irregularity did not affect the outcome of trial. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).) Under state law, defendant bears the burden of demonstrating any error deprived him of a fair trial. (See *Jablonski, supra*, 37 Cal.4th at p. 800.)

Here, defendant is not entitled to relief under either standard. As the trial court noted, the evidence presented to the grand jury after the trial court administered the oath was sufficient to support an indictment against defendant. The belated swearing-in of the grand jurors did not have a structural impact on those proceedings, as the grand jury, once properly sworn, received sufficient evidence to support the indictment.[8] Contrary to defendant's assertion, the error is susceptible to review for actual prejudice because we can review—and, indeed, have reviewed—the evidence that was presented to the grand jury after it was sworn. Unlike in *Vasquez v. Hillery, supra*, 474 U.S. 254, where racial animus of the grand jurors may have affected their decision of whether and how to charge the defendant, our review of these grand jury proceedings does not require us to speculate as to the jurors' motives. Consequently, we reject his claim that it is impossible to determine whether there was sufficient evidence to support his indictment, and we need not consider his claim that the indictment was based at least partly on evidence received prior to the jury being sworn.

### 2. *Asserted* Witt/Witherspoon *error*

**(2)** Defendant contends the trial court improperly excused five prospective jurors who expressed doubts about their willingness to impose the death penalty. Under state and federal law, prospective jurors may be excused for cause if their views on the death penalty would prevent or substantially impair the performance of their duties as jurors, even where the prospective jurors have not made it " 'unmistakably clear' that [they] would '*automatically*' vote a certain way." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1286 [82 Cal.Rptr.3d 265, 190 P.3d 616], quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844] and *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 88 S.Ct. 1770].) Unless a juror makes it clear that he or she is unwilling to set aside his or her beliefs and follow the law, a trial court may not dismiss a juror under *Witt/Witherspoon* based only on answers provided on a juror questionnaire. (*People v. Wilson*

---

[8] For example, after being sworn in, the grand jury heard testimony from Sanfilippo that defendant admitted to stabbing the young women with a knife and removing Powalka's and Corina's shorts. Sanfilippo also testified defendant disclosed the location of the firearm, and that officers had recovered a knife from defendant's residence.

(2008) 44 Cal.4th 758, 785–787 [80 Cal.Rptr.3d 211, 187 P.3d 1041]; *Stewart, supra*, 33 Cal.4th at p. 451.) Errors under *Witt/Witherspoon* mandate reversal of the penalty verdict without regard to prejudice. (*People v. Schmeck* (2005) 37 Cal.4th 240, 264 [33 Cal.Rptr.3d 397, 118 P.3d 451]; see *People v. Tate* (2010) 49 Cal.4th 635, 666–667 [112 Cal.Rptr.3d 156, 234 P.3d 428] [*Witt/Witherspoon* error does not compel reversal of guilt phase verdict].)

Jury selection in this case started with a large group of prospective jurors, some of whom were dismissed immediately due to hardship caused by jury service. Approximately 130 prospective jurors remained, and they were given questionnaires prepared jointly by the parties. The questionnaire inquired about, among other topics, the prospective jurors' opinions concerning the death penalty.

The trial court noted on the record that, for efficiency's sake, the parties had reviewed the completed questionnaires and, based solely on the responses, defendant agreed to stipulate to the excusal of some jurors who appeared to oppose the death penalty while the prosecutor agreed to do likewise for some jurors who appeared to support it. At one point, the trial court explicitly recited it was not excusing any prospective jurors for cause; rather, the parties were stipulating to the excusals. In total, the parties stipulated to the excusal of 33 prospective jurors, five of whom are the basis for this claim of error. If either party objected to the excusal of a prospective juror through this process, that person was not excused but was summoned later for voir dire. The trial court did not excuse any prospective juror over defendant's objection during this process. At the end of the stipulated excusals, defense counsel stated: "Your Honor, for the record, [the prosecutor] and I have both reviewed all of the questionnaires . . . . [¶] And as a matter of trial tactics, we had agreed to enter into stipulations regarding excusing by my count, 33 of the venire members, as we believe it's to the benefit of our client to do that."

The trial court then began its voir dire of the remaining prospective jurors, and eventually the jurors and alternate jurors were seated.

The Attorney General contends defendant has forfeited this claim on appeal, and we agree. We previously have barred belated challenges to stipulated excusals of prospective jurors. (See *People v. Benavides* (2005) 35 Cal.4th 69, 87–89 [24 Cal.Rptr.3d 507, 105 P.3d 1099] (*Benavides*); *People v. Ervin* (2000) 22 Cal.4th 48, 72–74 [91 Cal.Rptr.2d 623, 990 P.2d 506].)

Defendant nonetheless contends the logic of these decisions was undermined by other cases, such as *Stewart, supra*, 33 Cal.4th 425, *People v. Heard* (2003) 31 Cal.4th 946 [4 Cal.Rptr.3d 131, 75 P.3d 53], and *People v. Cash* (2002) 28 Cal.4th 703 [122 Cal.Rptr.2d 545, 50 P.3d 332]. Not so. *Stewart* involved the *dismissal* by the trial court of prospective jurors based on the questionnaire responses; in *Heard*, the trial court improperly dismissed a

prospective juror when during voir dire he clarified his questionnaire responses and indicated he could follow the trial court's instructions; and *Cash* was concerned with the trial court's refusal to permit questioning on whether specific acts of aggravation would cause a potential juror to automatically vote in favor of the death penalty. In contrast, in this case, as in *Benavides* and *Ervin*, the parties *stipulated* to the dismissal of the prospective jurors.

Our more recent case, *People v. Cook* (2007) 40 Cal.4th 1334 [58 Cal.Rptr.3d 340, 157 P.3d 950] (*Cook*), also is in accord with *Benavides* and *Ervin*. In *Cook*, prospective jurors completed a questionnaire that inquired about their views on the death penalty. The trial court permitted both the prosecution and the defense to move to exclude for cause various prospective jurors based solely on their questionnaires. (*Cook*, at p. 1341.) The trial court stated it would dismiss a prospective juror if both parties agreed to the excusal. (*Id.* at p. 1342.) The trial court also asked if there were " 'others that there's going to be a challenge for cause that you're willing to submit on the questionnaires?' " (*Ibid.*) The parties agreed to " 'submit on the questionnaires' " with respect to some prospective jurors, and the trial court clarified that they would be " 'thereby waiving [their] right to any further questioning.' " (*Ibid.*) If the trial court denied such a challenge, the parties could later question the prospective juror during voir dire. (*Ibid.*)

One prospective juror, Maria R., provided answers that cast doubt on her ability to vote for the death penalty. (*Cook, supra*, 40 Cal.4th at p. 1341.) The defendant "submit[ted]" as to the prosecutor's challenge for cause to Maria R.; the trial court granted the challenge, and the defendant did not comment. (*Id.* at p. 1342.) On appeal, we ruled the defendant had forfeited his right to complain about the trial court's failure to question Maria R. on voir dire because he repeatedly agreed to let the trial court decide such challenges for cause based solely on the questionnaire responses. (*Ibid.*) In so ruling, we noted that *Stewart*, upon which defendant here relies and the defendant in *Cook* similarly relied, presented a different situation; there, the trial court granted several challenges for cause based solely on questionnaire responses over the defendant's repeated objections and without the defendant's agreeing to the procedure. (*Cook*, at p. 1342; see also *Uttecht v. Brown* (2007) 551 U.S. 1, 15–20 [167 L.Ed.2d 1014, 127 S.Ct. 2218] [rejecting federal habeas corpus challenge in which defense counsel's acquiescence during an otherwise extensive voir dire supported the trial court's excusal of a potential juror for cause].)

Defendant here, like the defendant in *Cook*, agreed to the procedure whereby a prospective juror would be dismissed without voir dire if both parties stipulated to the dismissal. Of the five prospective jurors about whose dismissal he now complains, defendant stipulated to the dismissal of all of

them; unlike the defendant in *Cook*, defendant here did not object to the dismissal of any of the prospective jurors now challenged on appeal. In addition, defendant declined to stipulate to the dismissal of several other prospective jurors, and they were later summoned to voir dire. If defendant had wanted to retain any of the five dismissed prospective jurors for further questioning, he should not have stipulated to their dismissal.

Moreover, unlike the prospective jurors in *Cook* and *Stewart*, the trial court here did not excuse *any* prospective juror for cause—the parties *stipulated* to the excusals, as was the case in *Benavides* and *Ervin*. Although the discussion between the trial court and the parties focused on the prospective jurors' opinions about the death penalty, and those expressed opinions formed the basis for the parties' decisions regarding whether to stipulate to the dismissal, no prospective juror during this stage of the proceedings actually was dismissed for cause.

Defendant contends he stipulated to this prescreening procedure only at its conclusion, and thus could not have forfeited his right to challenge any purported errors that occurred during it, but this is simply not so: the record indicates the parties agreed to the procedure at its outset and then entered the stipulation into the record at its conclusion.

As defendant agreed to and participated in the process whereby some prospective jurors were excused through stipulations, he has forfeited his right to complain about this procedure.[9] And as none of the five challenged prospective jurors actually were dismissed for cause, the trial court made no findings on whether their views on the death penalty would prevent or substantially impair the performance of their duties as jurors, and we therefore have no basis on which to exercise our review.

### 3. *Asserted* Batson/Wheeler *error*

Defendant, who is African-American,[10] contends the prosecutor improperly excused four African-Americans (M.L.W., J.M., M.D.W., and D.J.) from the venire. (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], overruled in part by *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410]; *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712].)

---

[9] Were we to rule on the merits of a challenge to the stipulation process, we would hold the trial court did not abuse its discretion in allowing the parties to prescreen prospective jurors solely on the basis of their questionnaire responses. (*Benavides, supra*, 35 Cal.4th at pp. 88–89.)

[10] None of the victims were African-American.

Two of the seated jurors were African-American. The court noted only 6 or 7 percent of Riverside County residents were African-American.

 "It is well settled that '[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. [Citations.] Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. [Citations.]' [Citation.]

"The United States Supreme Court recently reaffirmed the procedure and standard to be used by trial courts when *Batson* motions challenging peremptory strikes are made. ' " 'First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.' " [Citation.]' (*Snyder v. Louisiana* (2008) 552 U.S. 472, 476–477 [170 L.Ed.2d 175, 128 S.Ct. 1203].)" (*People v. Hamilton* (2009) 45 Cal.4th 863, 898 [89 Cal.Rptr.3d 286, 200 P.3d 898].)

As explained below, we reject defendant's challenge to each of the excusals.

### a. *Factual background*

As noted, after hardship excusals approximately 130 potential jurors completed the juror questionnaire. Defense counsel noted that, according to the completed questionnaires, 64 percent of these prospective jurors identified themselves as Caucasian, 14 percent as Hispanic, 8 percent (10 out of 132) as African-American, 2 percent as Asian, 2 percent as other, and 10 percent did not specify. From this group, the parties stipulated to the excusal of at least 33 potential jurors. The trial court first questioned the prospective jurors, followed by counsel for each party.

From the panel of the first 20 prospective jurors, the prosecutor challenged a Hispanic prospective juror without objection.

### (1) *Prospective Juror M.L.W.*

When the prosecutor exercised his second peremptory challenge, against M.L.W., defendant made a motion under *Batson/Wheeler*.

Answers to the juror questionnaire indicated that M.L.W. was a religious person who opposed the death penalty and believed it was generally unnecessary, as murderers "will always have to answer to God and that's much worse

than facing death."[11] M.L.W. nonetheless expressed a willingness to set aside her personal beliefs. M.L.W.'s brother had been arrested for selling drugs, but M.L.W. felt he was fairly treated by the criminal justice system.

On voir dire, M.L.W. reiterated a willingness to set aside her personal beliefs regarding the death penalty. M.L.W. also was a crime victim: While driving on the freeway, someone pointed a gun at M.L.W., but she believed this experience would not affect her ability to serve as a juror.

In response to defendant's *Batson/Wheeler* motion, the trial court ruled defendant had failed to make a prima facie case of racial discrimination, although it did note that the first prospective juror peremptorily excused by the prosecutor was Hispanic. The trial court also noted M.L.W.'s religious reservations about the death penalty. Because the trial court ruled defendant had not made a prima facie case, the prosecutor did not explain why he peremptorily challenged M.L.W. The prosecutor later expressed concerns about M.L.W.'s religious beliefs and about jurors who felt they might be sinning or "going to hell" if they voted in favor of a death verdict.

The prosecutor then excused three more jurors, including an African-American (G.N.), without objection.

### (2) *Prospective Juror J.M.*

The prosecutor exercised his sixth peremptory challenge against J.M., and defendant made another *Batson/Wheeler* motion.

The juror questionnaire asked prospective jurors to indicate whether any relatives or close friends had been accused of a crime, and J.M. left this question blank. J.M.'s other responses indicated a generally favorable opinion of the death penalty.

On voir dire, the trial court asked J.M. if any family member had been accused of a crime, and J.M. said that none had. The prosecutor then pointed out that J.M.'s son had been prosecuted as a juvenile; J.M. responded by expressing confusion over whether the question applied to juvenile proceedings.

In denying defendant's *Batson/Wheeler* motion, the trial court ruled defendant failed to make a prima facie showing, as J.M. was "obviously hiding

---

[11] The prosecutor originally had sought to excuse for cause M.L.W. based on her questionnaire answers, but the trial court stated that it "would deny the challenge on that basis."

something." The prosecutor also accused J.M. of lying under oath and said there was no way J.M. would be kept on the panel.

### (3) *Prospective Juror M.D.W.*

The prosecutor exercised his seventh peremptory challenge against M.D.W., and defendant made a *Batson/Wheeler* motion.

Like M.L.W., M.D.W.'s juror questionnaire indicated she was a religious person but could set aside those beliefs for jury duty. M.D.W. indicated the death penalty was appropriate for a person who "deliberately and maliciously causes severe harm to others," but "the death penalty should only be used in instances where there can be no rehabilitating" and other people are at risk. The questionnaire also indicated M.D.W.'s aunt was charged with a crime and her children were taken away from her when the aunt's boyfriend killed one of the children in his care. Despite the emotional nature of that situation, M.D.W. felt "justice was served."

On voir dire, M.D.W. acknowledged that rehabilitation was just one possible factor in determining the appropriate penalty.

The trial court again ruled there was no prima facie showing of discrimination, citing M.D.W.'s concerns about rehabilitation; the trial court also noted her own awareness of being a "highly opinionated" person. The prosecutor acknowledged M.D.W. had given "correct verbal answers" but he felt she actually would be unable to vote for death.

The prosecutor then exercised three more peremptory challenges without objection.

### (4) *Prospective Juror D.J.*

When the prosecutor exercised his 11th peremptory challenge, against D.J., defendant again made a *Batson/Wheeler* motion.

D.J.'s juror questionnaire indicated he worked as a loss prevention officer for a department store and had family members who worked in law enforcement. D.J.'s younger brother had tossed his infant son (D.J.'s nephew) into the air and failed to catch him, and the child died. Although the brother was convicted of manslaughter, D.J. felt the outcome was fair. D.J.'s church was opposed to the death penalty, but he expressed a willingness to vote for the death penalty if it was appropriate.

The trial court denied defendant's *Batson/Wheeler* motion, finding no prima facie showing based on D.J.'s religious beliefs and some inconsistencies in answers about his incarcerated brother. The prosecutor also

noted D.J.'s body language was "angry and/or at least very uncomfortable," and noted D.J.'s concern about his brother's conviction. But the prosecutor was most concerned with D.J.'s religious beliefs and purported willingness to ignore those beliefs; the prosecutor suspected D.J. may have had a hidden agenda to spare defendant from the death penalty.

After the prosecutor had used his 13th (of 20 total) peremptory challenges, and defendant had used seven of his 20, the parties accepted the jury.

During the selection process for the alternate jurors, the prosecutor used all four of his peremptory challenges, including one against an African-American (M.R.), without objection.

### b. *Legal contentions*

In denying defendant's *Batson/Wheeler* motions, the trial court first found no prima facie showing of discrimination, and then explained its reasons for doing so; the.court, however, then invited the prosecutor to make additional remarks. The prosecutor each time concurred in the trial court's remarks and made additional observations. Thus, similar to *People v. Mills* (2010) 48 Cal.4th 158, 173–174 [106 Cal.Rptr.3d 153, 226 P.3d 276] (*Mills*), this case is a first stage/third stage *Batson* hybrid, as the record contains both the prosecutor's reasons and the trial court's evaluation (albeit implicit) of those reasons. Thus, as we did in *Mills*, we will express no opinion on whether defendant established a prima facie case of discrimination and skip to *Batson*'s third stage and evaluate the prosecutor's reasons for challenging these prospective jurors.

" 'Review of a trial court's denial of a [*Batson/Wheeler*] motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] ". . . We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" ' " (*People v. Taylor* (2009) 47 Cal.4th 850, 886 [102 Cal.Rptr.3d 852, 220 P.3d 872] (*Taylor*).)

"As part of our analysis, we consider as 'bearing on the trial court's factual finding regarding discriminatory intent' [citation] the comparisons of prospective jurors challenged and unchallenged that defendant expounds in his briefs, though few if any of these comparisons were made in the trial court. At the same time, 'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.' [Citation.] In addition to the

difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. 'Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' [Citation.]" (*Taylor, supra*, 47 Cal.4th at p. 887.)

As noted, with respect to each of the challenged prospective jurors, the trial court ruled defendant failed to demonstrate an inference of racial bias. Defendant contends the trial court erred in so ruling, as the prosecutor used six of his 13 peremptory challenges (including four of his first seven) to excuse African-Americans.[12] Only 10 of the prospective jurors in the venire, defendant observes, were African-American.

Defendant contends we cannot rely on the trial court's "speculations" about the prosecutor's possible reasons for challenging these prospective jurors. We disagree. The prosecutor expressly adopted the trial court's reasons, and his additional observations supplemented those of the trial court. Although defendant contends we "can have no confidence that the prosecutor's stated race-neutral reasons were really his own," there is nothing in the record to indicate they were not. Notably, the prosecutor explicitly adopted the trial court's reasons; there is no need for us to engage in speculation as to the prosecutor's reasons for the challenges, as the prosecutor actually offered reasons. Moreover, the record supports the inference that the prosecutor's offered reasons were genuine, as his questioning of each of these prospective jurors focused on the exact bases that the trial court cited in its rulings.

The trial court correctly denied defendant's *Batson/Wheeler* motion with respect to J.M. because of his less than forthcoming responses on the juror questionnaire and during voir dire regarding whether any family members were ever accused of committing a crime. Although defendant on appeal repeats J.M.'s stated confusion regarding whether the inquiry applied to juvenile adjudications, and contends there is "no reason to believe [J.M.] deliberately concealed this information" or "had some hidden agenda or would be biased against the prosecutor," the trial court and the prosecutor,

---

[12] With respect to G.N., the African-American prospective juror whom the prosecutor challenged without drawing an objection from defendant, the trial court noted that G.N. was "so far out on the outlying end of the bell curve" that there was no dispute as to his excusal. Similarly, Prospective Alternate Juror M.R. expressed so many negative experiences with law enforcement and the judicial system that both parties declined to ask further questions about those experiences. Thus, their excusals do not help defendant establish a pattern of discriminatory challenges.

who had the opportunity to observe J.M.'s demeanor, concluded J.M. had been untruthful. On the record before us, J.M.'s reluctance to discuss these matters sufficiently demonstrates that the proffered reasons for dismissing J.M. were not pretextual.

M.L.W., M.D.W., and D.J., the subject of defendant's first, third, and fourth *Batson/Wheeler* motions, were primarily excused due to their expressed reservations about the death penalty, reservations that were rooted in their religious beliefs.[13] In denying defendant's motions, the trial court noted that the prosecutor also had challenged prospective jurors of other races who expressed religious objections or concerns about the death penalty. The trial court then related its experience that African-Americans, as a group, are less supportive of the death penalty.

■ Defendant contends the trial court's comment about the effect of African-Americans' beliefs, as a group, on their ability to serve as capital jurors demonstrated impermissible racial bias. Not so. The prosecutor excluded these *specific* three prospective jurors not because of their race but rather because of their expressed doubts about the death penalty. And, as defendant concedes, a juror's reservations about the death penalty constitute a valid race-neutral reason for a peremptory challenge. (E.g., *People v. Salcido* (2008) 44 Cal.4th 93, 140–141 [79 Cal.Rptr.3d 54, 186 P.3d 437] (*Salcido*).) To the extent defendant contends these religious reservations acted as a proxy for racial discrimination, as the trial court noted and defendant concedes, the prosecutor also challenged jurors of other races based on these same reservations. (See *People v. Williams* (1997) 16 Cal.4th 153, 190–191 [66 Cal.Rptr.2d 123, 940 P.2d 710] [reliance on a reason asserted to be a proxy for race is permissible if there is a specific link between the stated reason and the basis for the challenge].) Consequently, defendant fails to demonstrate that the prosecutor's concerns over the prospective jurors' religious reservations were pretextual.

Defendant nonetheless contends the excusal of these prospective jurors functioned as impermissible religious discrimination. As defendant did not articulate this basis for his objection in the trial court, he has forfeited the claim on appeal. (See *People v. Thornton* (2007) 41 Cal.4th 391, 462 [61 Cal.Rptr.3d 461, 161 P.3d 3].) In any event, the claim lacks merit, as there is no evidence in the record the prosecutor discriminated against any particular religious

---

[13] M.D.W., M.L.W., and D.J. also had family members who had experiences with the criminal justice system. The prosecutor specifically expressed concern over D.J.'s brother's prosecution for the death of the brother's child, and how that experience might affect D.J.'s ability to serve as a juror. A negative experience with the criminal justice system is a valid neutral reason for a peremptory challenge. (E.g., *People v. Lenix* (2008) 44 Cal.4th 602, 628 [80 Cal.Rptr.3d 98, 187 P.3d 946].)

denomination. Nor is there any evidence the prosecutor excluded prospective jurors who expressed some sort of religious belief, or a religious belief that might theoretically interfere with the ability to return a death verdict. Rather, the prosecutor challenged only those who *actually* expressed a possible conflict between their religious beliefs and duties as a juror, which, as we have noted, is permissible.

### 4. *Asserted failure to determine racial bias of jurors*

Defendant contends the trial court erred by failing to determine whether any of the prospective jurors might be biased against him due to his race. As noted, defendant is African-American, his victims were not, and at the time of his trial, Riverside County was populated primarily by Caucasians.

The juror questionnaire did not expressly ask the jurors about any potential racial biases they might have, although one question did ask if there was anything about defendant's "appearance" that might cause a prospective juror to be biased. No prospective juror answered in the affirmative. During voir dire, defense counsel did ask the first group of prospective jurors whether any of them would be affected by the differences in race between defendant and the victims, and, again, no prospective juror responded in the affirmative.

As we have held repeatedly and as defendant implicitly acknowledges, he cannot complain on appeal about the trial court's failure to question the venire on racial prejudice unless he has requested specifically such an inquiry. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1152–1153 [95 Cal.Rptr.3d 652, 209 P.3d 977].) Defendant participated in drafting the juror questionnaire, questioned potential jurors but asked only one question during voir dire about differences between his race and the race of the victims, and does not justify his failure to request or conduct a more thorough inquiry. Defendant's reliance on *People v. Taylor* (1992) 5 Cal.App.4th 1299 [7 Cal.Rptr.2d 676] is thus unavailing because in that case, unlike here, the trial court controlled the voir dire and did not permit the attorneys to ask questions directly. Consequently, this claim is forfeited.

Citing *People v. Holt* (1997) 15 Cal.4th 619 [63 Cal.Rptr.2d 782, 937 P.2d 213] (*Holt*), defendant nonetheless contends the trial court was required to propound specific questions designed to reveal racial prejudice. Not so. In *Holt*, we ruled a trial court could not prevent counsel from asking such questions (see *id.* at pp. 660–661), but *Holt* in no way obligates a trial court to undertake such an inquiry. Similarly, in *Ristaino v. Ross* (1976) 424 U.S. 589, 597, footnote 9 [47 L.Ed.2d 258, 96 S.Ct. 1017], another case on which defendant relies, the high court ruled that "*voir dire* questioning directed to racial prejudice was not constitutionally required . . . ." When race is

"inextricably bound up" with the issues to be tried, however, a trial court might be required to make such an inquiry on its own initiative. (*Id.* at p. 597.) But other than the bare fact of the difference between the races of defendant and the victims, nothing about the circumstances of this crime suggests race played any role. (See *ibid.*; cf. *Ham v. South Carolina* (1973) 409 U.S. 524 [35 L.Ed.2d 46, 93 S.Ct. 848] [inquiry into racial prejudice was relevant, as the defendant was a civil rights activist who claimed he had been framed by law enforcement personnel].)

Even were we to agree that the interracial nature of this crime required further voir dire, we would find no reversible error. "Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal. [Citation.]" (*Holt, supra,* 15 Cal.4th at p. 661; see *People v. Robinson* (2005) 37 Cal.4th 592, 620–623 [36 Cal.Rptr.3d 760, 124 P.3d 363].) Defendant had the opportunity to further examine potential jurors about possible racial bias, either directly or indirectly through the juror questionnaire, but defense counsel apparently found no need to do so; moreover, defense counsel did not exhaust his allotment of peremptory challenges. (See *People v. Taylor* (2010) 48 Cal.4th 574, 607–610 [108 Cal.Rptr.3d 87, 229 P.3d 12] (*Taylor*).) Consequently, defendant's trial was not fundamentally unfair.

### B. *Guilt Phase Issues*

#### 1. *Admission of crime scene photographs*

Petitioner contends the trial court abused its discretion by admitting inflammatory, gruesome, cumulative, and irrelevant photographs of the victims' bodies and the surrounding crime scene.

Prior to the start of trial, defendant sought to exclude some photographs of the victims (taken at the crime scene or during their autopsies), arguing the nature of their wounds and the fact that the young women had once been alive was not in dispute. After conducting a hearing, the trial court excluded six photographs of Powalka (and not 12 others), one photograph of Amanda (and not 21 others), and five photographs of Corina (and not 15 others). In lieu of the autopsy photographs, defendant offered to stipulate to the cause of death for each of the victims, but the prosecutor refused the stipulation. Of the 48 photographs not excluded during this hearing, 39 ultimately were admitted into evidence at trial.

Defendant objected at trial to the admission of four photographs of the crime scene on the grounds of relevance and being unduly prejudicial; the

trial court overruled the objections. In total, the trial court admitted more than 100 photographs into evidence during the guilt phase.

We review for an abuse of discretion a trial court's admission of evidence. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 298 [106 Cal.Rptr.3d 459, 226 P.3d 949] (*D'Arcy*).) Having reviewed the photographs, we conclude the trial court did not abuse its discretion in admitting them.

At the outset, we note defendant did not object to many of the photographs admitted at trial; he also does not specify on appeal which photographs are the basis for this claim. As the failure to raise a timely objection forfeits the claim for appeal (see Evid. Code, § 353; *People v. Carey* (2007) 41 Cal.4th 109, 126 [59 Cal.Rptr.3d 172, 158 P.3d 743]), he cannot now complain about the majority of the photographs that were admitted. Regardless, even if defendant's claim could be applied to every photograph admitted at trial, his argument would still lack merit.

██ Defendant cites a variety of cases, some more than 50 years old, for the proposition that a trial court can abuse its discretion by admitting particularly gruesome photographs. As general rule this may be true, but cases of more recent vintage have recognized that photographs of murder victims are relevant to help prove how the charged crime occurred, and that in presenting the case a prosecutor is not limited to details provided by the testimony of live witnesses. (E.g., *D'Arcy, supra*, 48 Cal.4th at p. 299; see Evid. Code, § 350 [only relevant evidence is admissible].) The trial court, in applying this principle, properly reviewed the challenged photographs. It did not abuse its discretion in excluding some and ruling that others were relevant in proving the prosecutor's theory of the case, and that their probative value was not substantially outweighed by their prejudicial impact. (E.g., *Mills, supra*, 48 Cal.4th at pp. 191–192; see Evid. Code, § 352 [evidence that is relevant still may be excluded if it creates a substantial danger of prejudicing, confusing, or misleading the jury, or would consume an undue amount of time].)

██ Citing *People v. Poggi* (1988) 45 Cal.3d 306, 322–323 [246 Cal.Rptr. 886, 753 P.2d 1082] (*Poggi*) and *People v. Ramos* (1982) 30 Cal.3d 553, 577–578 [180 Cal.Rptr. 266, 639 P.2d 908], defendant contends the prosecutor was obligated to accept his offer to stipulate to the cause of death of each of the murder victims. Defendant's reliance on these cases is misplaced, as both involved photographs of the victims while alive, which were used to

demonstrate they were killed by the attacks in question.[14] The prosecutor here did not introduce the photographs from the crime scene and autopsies solely to establish the fact of their deaths, but rather to demonstrate that defendant committed murder. As defendant's plea of not guilty put all elements of each offense at issue (e.g., *People v. Steele* (2002) 27 Cal.4th 1230, 1243 [120 Cal.Rptr.2d 432, 47 P.3d 225]), defendant's mental state during the commission of the crimes was relevant, and his proposed stipulation would not have relieved the prosecutor from proving this element. Despite the graphic nature of some of these photographs, the prosecution may present a persuasive and forceful case and, except as limited by Evidence Code section 352, it is not required to sanitize its evidence. (See, e.g., *Salcido, supra*, 44 Cal.4th at p. 147.)

■ Defendant nonetheless argues none of the photographs "had any tendency in reason to prove that these offenses were premeditated as opposed to being impulsive, rash, unconsidered acts." But as the trial court noted, many of the photographs highlighted the attacks on the victims' throats, which tended to prove an intent to kill. Malice aforethought is an element of murder. (§ 187, subd. (a).) The photographs also supported the prosecutor's argument that the same person committed all of these crimes.[15] Moreover, the prosecutor alleged Powalka and Corina were murdered during the commission or attempted commission of rape (and that Corina was murdered during the commission or attempted commission of a lewd act). Some of the photographs depicted their nearly identical states of undress, which could have helped prove the necessary mental state required for these allegations.

Defendant further contends the photographs should have been excluded as cumulative to the testimony provided by live witnesses, but we have often rejected that argument (e.g., *D'Arcy, supra*, 48 Cal.4th at p. 299), and do so again here. Defendant also contends the photographs were cumulative, but the trial court did exercise its discretion and excluded some photographs as cumulative. To the extent that objection has not been forfeited with respect to the remaining photographs, defendant does not specify on appeal which photographs were cumulative to the others (see *People v. Farnam* (2002) 28 Cal.4th 107, 185 [121 Cal.Rptr.2d 106, 47 P.3d 988]), and as more than 100 photographs were admitted into evidence at trial, we decline to hazard a guess on his behalf.

---

[14] Over defendant's objection, the trial court did admit some photographs of the victims while they were alive. To the extent defendant contends on appeal that the trial court erred in admitting these photographs, any such error was not prejudicial. (See, e.g., *Poggi, supra*, 45 Cal.3d at p. 323.)

[15] During the closing argument in the guilt phase, defense counsel argued there was a possibility that Maddox committed some (and possibly all) of the charged crimes.

## 2. *Sufficiency of the evidence*

Defendant contends there was insufficient evidence to support the convictions of first degree murder, attempted murder, and arson, as well as the special circumstances of murder during the commission or attempted commission of rape or a lewd act, or multiple murders. During closing argument for the guilt phase, defense counsel argued there was a possibility that Maddox committed some—or all—of these acts. Defense counsel also urged that, if the jury believed defendant had murdered the victims, he should be found guilty only of second degree murder.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]' [Citation.]" (*D'Arcy, supra*, 48 Cal.4th at p. 293.) The same standard of review applies in evaluating the sufficiency of the evidence to support special circumstance findings. (E.g., *People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664] (*Lindberg*).)

### a. *First degree murder*

Defendant contends the evidence at trial demonstrated that he killed the victims as a result of an "unconsidered or rash impulse" rather than with the premeditation and deliberation required for first degree murder.

A murder that is willful, deliberate, and premeditated is murder in the first degree. (§ 189.) " 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]" ' [Citation.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1286–1287 [78 Cal.Rptr.3d 295, 185 P.3d 727].)

" 'Generally, there are three categories of evidence that are sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] . . . But these categories of evidence, borrowed from *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942], "are descriptive, not normative." [Citation.] They are simply an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." [Citation.]' [Citation.]" (*People v. Elliot* (2005) 37 Cal.4th 453, 470–471 [35 Cal.Rptr.3d 759, 122 P.3d 968] (*Elliot*).) These three categories are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive. (See, e.g., *People v. Brady* (2010) 50 Cal.4th 547, 562 [113 Cal.Rptr.3d 458, 236 P.3d 312] (*Brady*).)

Defendant contends the evidence at trial indicated that he "accidentally nicked" Corina, who then overreacted and accused him of trying to stab her. Then, as Corina fled to the bathroom, defendant contends, Powalka threatened to shoot him with the gun, so he disarmed her. Amanda then charged defendant, he claims, and in the ensuing melee he stabbed the two young women (and eventually shot Amanda in the head). From this, defendant concludes, he is guilty of manslaughter (on a theory of imperfect self-defense) or, at worst, three counts of second degree murder spurred by an unconsidered and rash impulse. While such a scenario might have been *possible* (although not entirely consistent with what defendant told the police), on review we do not reevaluate the credibility of witnesses or resolve factual conflicts; rather, we presume the existence of every fact in support of the verdict that could reasonably be inferred from the evidence. (See *Lindberg, supra,* 45 Cal.4th at p. 27.) Under this standard, the prosecution's evidence supported the verdict.

With respect to Powalka and Amanda, the evidence supports these first degree murder convictions: a trier of fact reasonably could have concluded that after defendant's initial incident with Corina, he murdered these two victims because they could identify him. (See, e.g., *Elliot, supra,* 37 Cal.4th at pp. 470–472 [the jury could have concluded a victim was killed to eliminate her as a witness].) Although the decision to kill Powalka and Amanda may have been formed quickly, a trier of fact reasonably could have concluded that defendant killed them in a cold and calculated attempt to silence them.

With respect to Corina, the evidence also similarly supports a conviction of first degree murder. Although defendant claims he only "nicked" Corina, the wounds on her throat indicate she, too, was killed deliberately. Even under defendant's version of the events that night, either Corina retreated to the

bathroom or he threw her in there. Defendant told the police that he then locked the bathroom. Defendant denied barricading the bathroom door with the chest of drawers, but a trier of fact reasonably could have concluded otherwise, as that certainly was a reasonable explanation (if not the most reasonable one) as to who placed the furniture there and for what purpose. Regardless, defendant told the police that Corina was alive when she went into the bathroom and he trapped her in there. From this, a trier of fact reasonably could have concluded that prior to returning to the bathroom to eventually kill Corina, defendant rapidly and coolly concluded he needed to eliminate her, too, as a witness.

Defendant contends it would have been illogical for him to kill the young women yet let Maddox live. The evidence at trial, however, supports the reasonable conclusion that the two men were friends, and that defendant believed Maddox would not tell the police about the crimes. Maddox in fact did not report the killings and initially lied to the police when he was questioned.

To the extent defendant argues the young women had just met him and thus would not have been able to identify him, which would have obviated the need to kill them (to eliminate them as witnesses), this rationale also fails: the young women all knew Maddox, and also knew Maddox knew defendant. Had any of the young women survived, they would have readily identified their assailant as a friend of Maddox's, which, as the evidence at trial demonstrated, would have led the police to defendant. In addition, the young women had spent much of the night with defendant, making it more likely they would be able to identify him, contrary to defendant's arguments.

b. *Rape and lewd act by force*

Notwithstanding the sufficiency of the evidence to support his first degree murder conviction for murdering Corina on a theory of premeditation and deliberation, defendant contends the evidence at trial did not prove that he raped Corina, committed a lewd act on her by force, or attempted to do either for purposes of a felony-murder theory. As noted, in addition to the first degree murder convictions, the jury further found true that Corina's murder was committed during the commission or attempted commission of a rape[16] (§ 190.2, former subd. (a)(17)(iii), now (a)(17)(C)) or a lewd act by force on a child under 14[17] (§ 190.2, former subd. (a)(17)(v), now (a)(17)(E)). Corina was 12 years old when defendant committed these crimes.

---

[16] Rape is, among other acts not relevant here, sexual intercourse "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).)

[17] Section 288, subdivision (a), prohibits "willfully and lewdly commit[ting] any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is

In addition to instructing the jury that a verdict of first degree murder required the jury to find that defendant acted with premeditation and deliberation, the trial court instructed it in the alternative that a murder is committed in the first degree if the killing occurred "during the commission or attempted commission of the crime of rape or lewd act by force with a child." (See § 189.)

██ For felony murder, the required mental state is the specific intent to commit the underlying felony. (*People v. Friend* (2009) 47 Cal.4th 1, 49 [97 Cal.Rptr.3d 1, 211 P.3d 520] (*Friend*).) The killing is considered to be committed in the perpetration of the underlying felony if the acts were part of a continuous transaction. (E.g., *People v. Prince* (2007) 40 Cal.4th 1179, 1259 [57 Cal.Rptr.3d 543, 156 P.3d 1015] (*Prince*).) No strict causal or temporal relationship between the murder and underlying felony is required. (E.g., *ibid.*)

The jury found true the special circumstance that Corina's murder was committed while defendant "was engaged in . . . the commission of, attempted commission of, or the immediate flight after committing, or attempted to commit" rape or a lewd act by force. (§ 190.2, subd. (a)(17).) As with felony murder, there need not be a strict temporal relationship between the murder and the target felony for purposes of the special circumstance finding. (E.g., *People v. Rowland* (1992) 4 Cal.4th 238, 271–272 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

██ An attempt to commit a crime requires the specific intent to commit the target crime (in this case, rape or a lewd act by force) and a direct but ineffectual act, beyond mere preparation, done towards its commission. (*People v. Rundle* (2008) 43 Cal.4th 76, 138 [74 Cal.Rptr.3d 454, 180 P.3d 224], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].) ██ Intercourse after death does not necessarily negate the felony-murder rule or the rape-murder special-circumstance finding, as postmortem intercourse could constitute an attempt to commit rape, provided it was part of a continuous transaction and the intent to commit rape was formed prior to the murder. (See, e.g., *People v. Lewis* (2009) 46 Cal.4th 1255, 1299–1301 [96 Cal.Rptr.3d 512, 210 P.3d 1119] (*Lewis*).) The same is true for a postmortem lewd act. (See, e.g., *People v. San Nicolas* (2004) 34 Cal.4th 614, 660–661 [21 Cal.Rptr.3d 612, 101 P.3d 509] (*San Nicolas*).)

under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ." Section 288, subdivision (b)(1) prohibits a lewd act committed by "use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ."

Defendant contends there was insufficient evidence to support the inference that he intended to commit a sexual act on Corina. Defendant correctly notes Corina did not exhibit any signs of genital trauma, and no semen was found on her body or clothing. As noted, however, Corina was discovered with her shorts and panties around her left knee, her legs spread open, and with bloodstains on her thighs that were consistent with handprints.

Citing *People v. Anderson, supra,* 70 Cal.2d 15, *People v. Granados* (1957) 49 Cal.2d 490 [319 P.2d 346], and *People v. Craig* (1957) 49 Cal.2d 313 [316 P.2d 947], defendant contends the physical evidence was insufficient to support a finding that he intended to commit a sexual act. *Anderson, Granados,* and *Craig* are dependent on their particular facts. Defendant, notably unlike the defendants in those three cases, at one point admitted to the police that he "kind of helped" Corina take off her shorts and "might of touched" her "down there"; he also admitted that he touched her during the course of removing her shorts and the bloodstains on her thighs were consistent with handprints. Thus, the case against defendant rested on more than simply Corina's nudity. (See, e.g., *Lewis, supra,* 46 Cal.4th at pp. 1290–1291, fn. 24.) Thus, a reasonable trier of fact could have relied upon the physical evidence, coupled with defendant's (albeit somewhat equivocal) admission, and concluded that he took direct action toward the commission of a lewd act.

Moreover, Powalka, like Corina, had her shorts and panties rolled around her left knee; this similarity supports the inference that he harbored the lustful intent required by section 288. In *People v. Holloway* (2004) 33 Cal.4th 96, 138–139 [14 Cal.Rptr.3d 212, 91 P.3d 164], we affirmed a burglary conviction (and related special circumstance finding) where a conclusion that the defendant possessed the requisite felonious intent to commit rape reasonably could have been drawn from the fact that he entered the victim's residence after attempting to sexually assault another victim outside the residence. In this case, Corina's and Powalka's nearly identical states of undress similarly support the inference that Corina's murder occurred during an attempt to commit a lewd act with her.[18]

Defendant finally contends there was insufficient evidence Corina was alive when he sexually assaulted her, or at least attempted to do so. A trier of fact, however, reasonably could have concluded Corina was alive during the sexual assault (or attempt), as defendant specifically told the police he instructed her to remove her shorts and then "kind of helped" her in doing so. For defendant to have so instructed Corina and then assisted in removing her shorts, she necessarily still must have been alive at the time. Regardless, even

---

[18] As noted, however, the jury did not find true the special circumstance allegation that Powalka was murdered during the commission of rape or attempted rape.

if Corina's death preceded defendant's sexual assault on her, a trier of fact reasonably could have found the assault and murder to be a continuous course of conduct, and that defendant formed the intent to sexually assault Corina while she was still alive. (See *Lewis, supra,* 46 Cal.4th at pp. 1299–1301; *San Nicolas, supra,* 34 Cal.4th at pp. 660–661.)

### c. *Arson*

Defendant contends there was insufficient evidence he started the fire in the apartment with the intent to destroy the crime scene, and thus did not commit arson.[19] Defendant told the detectives he might have placed the bag of clothing on the kitchen stove and then turned on the burner.

██ Arson, as a general intent crime, requires only that a person possess the intent to burn (or cause to be burned) a structure (or forest land or property); it does not require an intent to do a further act or achieve a future consequence. (See *People v. Atkins* (2001) 25 Cal.4th 76, 87–89 [104 Cal.Rptr.2d 738, 18 P.3d 660].)

Defendant, cursorily citing several cases, contends the prosecutor failed to prove the typical indicia of arson, such as multiple distinct fires in the dwelling, the presence of inflammatory materials or accelerants, a motive such as indebtedness, or a history of pyromania. Defendant here, however, admitted he starting the fire by placing flammable materials on a stove and then turning it on; in other words, this fire was not accidental. Consequently, a trier of fact reasonably could have concluded that he intended to set the apartment on fire. That his methodology was not the most efficient way to start a fire does not undermine the jury's finding that he intended to burn the structure. Moreover, given that defendant had committed three murders, his possible motive for arson was readily apparent: to spoliate the crime scene and create a distraction while he made his escape.

### d. *Attempted murder*

Defendant contends there was insufficient evidence he attempted to murder Powalka's infant son, Eric. Defendant denied knowing Eric was in the apartment, but recalled hearing a baby cry during the evening.

██ Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended

---

[19] Arson is committed when a person "willfully and maliciously sets fire to or burns or causes to be burned . . . any structure, forest land, or property." (§ 451.) As the term is used in section 451, "maliciously" involves acting with "a wish to vex, defraud, annoy, or injure another person, or an intent to do a wrongful act . . . ." (§ 450, subd. (e).)

killing. (*People v. Ervine* (2009) 47 Cal.4th 745, 785 [102 Cal.Rptr.3d 786, 220 P.3d 820] (*Ervine*).) Attempted murder requires express malice, that is, the assailant either desires the victim's death, or knows to a substantial certainty that the victim's death will occur. (See *People v. Smith* (2005) 37 Cal.4th 733, 739 [37 Cal.Rptr.3d 163, 124 P.3d 730].)

Defendant contends the evidence does not support the finding that he intended to kill Eric. Defendant claims he did not know Eric was in the apartment, as he told the police only that he had heard a baby, somewhere, crying that night. Eric's playpen, however, was next to Powalka's blood-stained bed. Given his acknowledgment of the presence of a baby and the location of the playpen, a trier of fact reasonably could have concluded defendant was aware Eric was in the apartment when defendant attempted to set it on fire. Furthermore, defendant placed flammable materials on a stove and turned it on, which generated a lethal amount of smoke and caused moderate damage to the kitchen. Thus, a trier of fact reasonably could have found that defendant, by starting a fire and then leaving the apartment, was substantially certain that the remaining inhabitant—a helpless infant—would be killed. That the fire did not spread to other rooms, or that Eric was rescued before dying from smoke inhalation, does not undermine the jury's finding regarding defendant's intent.

### e. *Multiple-murder special-circumstance findings*

Defendant contends there was insufficient evidence to support the multiple-murder special-circumstance findings, because for this special circumstance to apply at least one of the murders must have been in the first degree, and he disputes the sufficiency of the evidence to establish that any of the murders were of the first degree. (See § 190.2, subd. (a)(3); *People v. Cooper* (1991) 53 Cal.3d 771, 828 [281 Cal.Rptr. 90, 809 P.2d 865].) As we have explained, however, the evidence supports the jury's verdict that all three murders were of the first degree.

As noted, the jury found true the multiple-murder special-circumstance allegation with respect to each victim. Defendant contends, and we agree, that two of the three multiple-murder special-circumstance findings are superfluous. (E.g., *People v. Zamudio* (2008) 43 Cal.4th 327, 363 [75 Cal.Rptr.3d 289, 181 P.3d 105].) Prior to the start of the penalty phase, however, the trial court explained to the jury that its three separate findings were to be considered as a single special circumstance. Moreover, the judgment reflects only one multiple-murder special-circumstance finding. Although defendant is correct two of the jury's three multiple-murder special-circumstance findings were superfluous, the trial court's instructions removed any potential error, and the judgment correctly reflects a single finding.

### 3. *Lack of jury instruction on necessity of a live victim*

Defendant contends the trial court erred by failing to instruct the jury, on its own motion, that the commission of a rape or lewd act by force required a live victim. Although defendant did not request a jury instruction on this precise point, he contends there was sufficient evidence that Corina was dead before he sexually assaulted her, and the trial court therefore was required to instruct the jury it was not legally possible for him to commit rape or a lewd act by force if she already was dead, he knew she was dead, and he formed the intent to commit the sex act only after she had died.

The crime of rape requires a live victim; the intent to have sexual intercourse with a dead body is neither rape nor attempted rape. (E.g., *Lewis, supra,* 46 Cal.4th at pp. 1299–1301.) The same is true for committing a lewd act. (See, e.g., *San Nicolas, supra,* 34 Cal.4th at pp. 660–661.)

This contention of error lacks merit. Defendant's contrary assertions on appeal notwithstanding, his statements to police implied Corina was alive when he helped her remove her shorts. Defendant admitted Corina was bleeding at the time, but he specifically told the police that "[s]he wasn't stabbed all the way, I only cut [her] a little bit." Although defendant stated Corina was lying down at the time and did not say anything, that is not evidence that she was dead, especially in light of defendant's specific statement that her injuries were not serious at that time. And, as noted, defendant also initially told the police that he *ordered* Corina to remove her shorts; defendant does not explain why he would give orders to someone who was already dead.

Even were we to agree with defendant that the evidence suggested Corina might have been already dead, the trial court did not err in failing to instruct on its own motion as to this particular theory. In criminal cases, even absent a request, a trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence. (E.g., *People v. Martinez* (2010) 47 Cal.4th 911, 953 [105 Cal.Rptr.3d 131, 224 P.3d 877] (*Martinez*).) A trial court, however, has a duty to instruct on its own initiative on a particular defense only if it appears the defendant is relying on such a defense, or substantial evidence supports the defense and it is consistent with the defendant's theory of the case. (*Ibid.*)

At trial, defendant did not rely upon the theory that Corina was already dead; rather, defense counsel suggested that Maddox was partially (or totally) responsible for the crimes, or, alternatively, that defendant's own actions did not rise to the level of first degree murder. Although this claim that Corina was already dead, raised for the first time on appeal, is not entirely inconsistent with the theory defendant presented at trial, as we have explained, no

substantial evidence was presented at trial that would have compelled the trial court to instruct the jury on this particular defense.

Defendant relies heavily on *People v. Sellers* (1988) 203 Cal.App.3d 1042 [250 Cal.Rptr. 345] (*Sellers*), in which the Court of Appeal reversed the defendant's conviction of rape and first degree murder, as well as a rape-murder special-circumstance finding, due to the trial court's failure to instruct the jury that rape requires a live victim. *Sellers* is readily distinguishable, however, because in that case substantial evidence was presented at trial that the victim was dead when the defendant had sexual intercourse with her body. Under the defendant's theory of the case in *Sellers*, he killed the victim, left and returned to the crime scene an hour or two later, and then performed the sex act. This substantial passage of time bolstered the defendant's theory the victim was dead, that he formed the intent to commit the sex act only after her death, and that the rape and murder were not part of a continuous course of conduct. Moreover, the lack of a live victim was a key theory of the defendant's case, and the trial court there refused to use the defendant's proffered jury instructions that highlighted this theory. Similarly, in *People v. Kelly* (1992) 1 Cal.4th 495 [3 Cal.Rptr.2d 677, 822 P.2d 385] (*Kelly*), due to instructional error we reduced a rape conviction to attempted rape because there was some evidence that the defendant, despite his admission to the contrary, killed a victim at one location and had sexual intercourse with her body in another. This reduction, however, had no effect on the accompanying murder and special circumstance findings. (*Id.* at p. 528.)

In contrast to *Sellers* and *Kelly*, the evidence presented at defendant's trial of any purported postmortem sexual activity (or intent) consisted solely of a highly charitable interpretation of defendant's statements to the police, as he never specifically told them he sexually assaulted Corina (or formed the intent to do so) only after her death. Even if Corina was dead when defendant removed her shorts, the evidence at trial still supported a theory that defendant's acts constituted a continuous course of conduct following from an intent that defendant formed while Corina was still alive. As we have explained, *ante*, the evidence was sufficient to support the conviction for first degree murder based on a felony-murder theory, as well as the related felony-murder special-circumstance findings. In addition, there was no evidence the killing and sexual assault took place at different locations. Moreover, defendant at trial did not advance, let alone rely on, this theory of the case. Consequently, the trial court did not err in failing to instruct the jury on a theory of the case that was neither substantially supported by the evidence nor relied on by defendant at trial.

To the extent defendant contends the trial court failed to instruct the jury that an antemortem-formed intent to commit rape or a lewd act by force

is required for a first degree felony-murder conviction, we repeatedly have held that CALJIC No. 8.21,[20] which the trial court read to the jury here, adequately conveys that the required intent must be formed before the murder occurred. (E.g., *People v. Jones* (2003) 29 Cal.4th 1229, 1258–1259 [131 Cal.Rptr.2d 468, 64 P.3d 762].)

4. *Lack of jury instruction on lesser included offense of manslaughter*

Defendant contends the trial court erred by refusing his request to instruct the jury on voluntary manslaughter with respect to the deaths of Powalka and Amanda.[21] Defendant told the police that he accidentally "nicked" Corina, and Powalka responded by retrieving her handgun and threatening to shoot him. Defendant then claimed he struck Powalka and took the gun from her. Amanda, defendant told police, charged him, and during the ensuing melee he stabbed both victims and eventually shot Amanda.

■■■ As noted, a trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence. (E.g., *Martinez, supra,* 47 Cal.4th at p. 953.) It is error for a trial court not to instruct on a lesser included offense when the evidence raises a question whether all of the elements of the charged offense were present, and the question is substantial enough to merit consideration by the jury. (E.g., *Taylor, supra,* 48 Cal.4th at pp. 623–625.) When there is no evidence the offense committed was less than that charged, the trial court is not required to instruct on the lesser included offense. (E.g., *People v. Moye* (2009) 47 Cal.4th 537, 548 [98 Cal.Rptr.3d 113, 213 P.3d 652] (*Moye*).) Voluntary manslaughter is a lesser included offense of murder. (E.g., *id.* at p. 549.)

On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense. (E.g., *People v. Avila* (2009) 46 Cal.4th 680, 705 [94 Cal.Rptr.3d 699, 208 P.3d 634].)

---

[20] CALJIC No. 8.21, as modified and read by the trial court, provided: "The unlawful killing of a human being, whether intentional, unintentional, or accidental, which occurs during the commission or attempted commission of the crime of rape or lewd act by force with [a] child is murder of the first degree when the perpetrator had the specific intent to commit the crime. [¶] The specific intent to commit rape or lewd act by force with [a] child and the commission or attempted commission of such crime must be proved beyond a reasonable doubt."

[21] The trial court refused to instruct the jury with CALJIC Nos. 8.37 (manslaughter—defined), 8.40 (voluntary manslaughter—defined), 8.42 (sudden quarrel or heat of passion and provocation explained), 8.43 (murder or manslaughter—cooling period), 8.44 (no specific emotion alone constitutes heat of passion), 8.50 (murder and manslaughter distinguished), 8.72 (doubt whether murder or manslaughter), and 8.74 (unanimous agreement as to offense—first or second degree murder or manslaughter).

 Defendant, relying on *People v. Vasquez* (2006) 136 Cal.App.4th 1176 [39 Cal.Rptr.3d 433], contends there was sufficient evidence that he committed voluntary manslaughter under a theory of imperfect self-defense, and thus the trial court should have instructed the jury on this lesser included offense. Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury. (E.g., *People v. Cruz* (2008) 44 Cal.4th 636, 664 [80 Cal.Rptr.3d 126, 187 P.3d 970].) Such a killing is deemed to be without malice and thus cannot be murder. (E.g., *ibid.*) The doctrine of imperfect self-defense cannot be invoked, however, by a defendant whose own wrongful conduct (for example, a physical assault or commission of a felony) created the circumstances in which the adversary's attack is legally justified.[22] (E.g., *People v. Valencia* (2008) 43 Cal.4th 268, 288 [74 Cal.Rptr.3d 605, 180 P.3d 351]; cf. *People v. Randle* (2005) 35 Cal.4th 987, 1001–1003 [28 Cal.Rptr.3d 725, 111 P.3d 987] [defendant's retreat, and the subsequent recovery of the decedent's stolen goods, extinguished the decedent's legal justification to attack], overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201 [91 Cal.Rptr.3d 106, 203 P.3d 425]; *Vasquez, supra,* 136 Cal.App.4th at pp. 1178–1180 [although the defendant initiated the verbal quarrel, the decedent's physical response was unlawful].)

Defendant contends he was entitled to an instruction on imperfect self-defense, as there was evidence that he (actually but unreasonably) believed he was in imminent danger of being killed or suffering great bodily injury at the hands of Powalka and Amanda. As defendant initiated the attack on Corina, however, and there was no evidence that Powalka's and Amanda's subsequent actions were not legally justified, he may not claim imperfect self-defense.

Defendant nonetheless contends there was evidence that he was not the initial *aggressor* because he told the police that he *accidentally* inflicted Corina's injuries, and thus he claims his conduct was not *wrongful.* (See § 26, class Five.) Accordingly, defendant contends because there was evidence that he harbored no criminal intent when he first cut Corina, there was sufficient evidence to warrant the voluntary manslaughter instruction.

---

[22] Defendant cursorily contends that Powalka and Amanda were not legally justified in using force against him, but the use of force, even deadly force, to defend a third party may be legally justified. (E.g., §§ 197, subd. 1 ["Homicide is also justifiable when . . . : [¶] . . . resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon another person . . ."], 694.) The evidence highlighted by defendant indicates Powalka threatened to use force to defend Corina, and Amanda attempted to use force to defend Powalka; conversely, there was no evidence that the women's actions against him were not legally justified, his argument on appeal notwithstanding.

Even were we to agree with defendant that an "accidental" stabbing is not wrongful, which according to him would allow him to claim imperfect self-defense, the evidence was not sufficiently substantial to warrant this jury instruction. (See, e.g., *Taylor, supra*, 48 Cal.4th at pp. 623–625.) Defendant told the police, "I already stabbed [Corina] once on accident[;] *I just stabbed her again*." (Italics added.) Thus any potential claim of imperfect self-defense evaporated when he intentionally stabbed Corina a second time. Although defendant on appeal prefers to highlight his statements to the police in which he omitted mentioning this second, intentional stabbing, the evidence introduced at trial—consisting of his contradictory accounts of how he stabbed Corina—simply was not substantial enough to merit the requested jury instruction.

Finally, defendant contends he was entitled to a voluntary manslaughter instruction based on a theory of heat of passion,[23] claiming he was provoked into killing Powalka and Amanda by their aggressive actions towards him. Unsurprisingly, defendant fails to cite any case or statutory law supporting his proposition that Powalka's anger at him for cutting Corina, and Amanda's later anger for his attack on Powalka, somehow "provoked" him into killing them. Consequently, the trial court did not err in declining to instruct the jury on this theory.

### 5. *Asserted prosecutorial misconduct*

Defendant contends the prosecutor, during closing arguments, improperly attempted to shift the burden of proof onto him. During the closing argument, the prosecutor told the jury:

"I had the burden of proof when this trial started to prove the defendant guilty beyond a reasonable doubt, and that is still my burden. It's all on the prosecution. I'm the prosecutor. That's my job.

"The defendant was presumed innocent until the contrary was shown. That presumption should have left many days ago. He doesn't stay presumed innocent."

Defendant objected to this remark; in response, the trial court instructed the jury: "Well, ladies and gentlemen, the presumption of innocence is the point at which you start the case. At some point you come to the conclusion the

---

[23] Murder is the unlawful killing of a human being with malice aforethought. (See § 187, subd. (a).) A murder, however, may be reduced to voluntary manslaughter if the victim engaged in provocative conduct that would cause an ordinary person with an average disposition to act rashly or without due deliberation and reflection. (E.g., *Moye, supra*, 47 Cal.4th at pp. 549–550.)

person is guilty, the presumption is gone. On the other hand, if you find the person is not guilty, the presumption of innocence is always there. Again, you have to interpret how to use that."

After this instruction, the prosecutor continued: "As the Court instructed you, I was correct, that the defendant starts out with the presumption of innocence. That doesn't stay. That isn't an automatic thing forever. That's why we have a trial. Once the evidence convinces you he is no longer innocent, that presumption vanishes. That's all it is."

Later during his closing argument, the prosecutor stated: "If you read histories about the theory of reasonable doubt—not theory, the facts and the presumption of innocence, you'll understand that when the law tried many centuries ago to prove—there was a requirement at one time that everything had to be proved absolutely. They found they couldn't do it. They could never prove everything absolutely to anybody as long as it had to do with human affairs. There was no way to ensure that, so you were allowed some possible or imaginary doubt. The real test, the law says, is do you have an abiding conviction as to the truth of the charges. Don't you already before we go through it?" Outside the presence of the jury, defendant objected to these remarks, and the trial court overruled the objection.[24]

▌ A prosecutor's conduct violates the federal Constitution when it infects the trial with unfairness, and violates state law if it involves the use of deceptive or reprehensible methods of persuasion. (See, e.g., *Martinez, supra,* 47 Cal.4th at p. 955.) To preserve a misconduct claim for appellate review, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the remark (or conduct) unless such an admonition would not have cured the harm. (E.g., *id.* at p. 956.) When the claim focuses on the prosecutor's comments to the jury, we determine whether there was a

---

[24] After defendant's objections, the prosecutor argued to the jury, "The one thing I want to make clear to you about reasonable doubt and presumption of innocence is something that I would like you to keep in mind . . . is this: Until you reach a verdict, of course the defendant is not guilty. If a presumption attaches to a defendant when the trial starts, if they are then found guilty somewhere along the way, of course that presumption has vanished." Defendant did not object to this statement.

The trial court instructed the jury the prosecutor was required to prove beyond a reasonable doubt every essential element of the charged offenses (CALJIC No. 2.61); defendant was presumed innocent until the contrary was proven beyond a reasonable doubt (CALJIC No. 2.90); and to disregard any conflicting statements made by the attorneys concerning the law (CALJIC No. 1.00).

To the extent defendant contends the prosecutor's remarks misstated the burden of proof required to prove guilt beyond a reasonable doubt, automatic reversal under *Sullivan v. Louisiana* (1993) 508 U.S. 275 [124 L.Ed.2d 182, 113 S.Ct. 2078] is not compelled because the trial court properly instructed the jury on the required burden of proof.

reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion. (*Friend, supra,* 47 Cal.4th at p. 29.)

██ A defendant is presumed innocent until proven guilty, and the government has the burden to prove guilt, beyond a reasonable doubt, as to each element of each charged offense. (§ 1096; e.g., *People v. Kobrin* (1995) 11 Cal.4th 416, 419 [45 Cal.Rptr.2d 895, 903 P.2d 1027]; *People v. Freeman* (1994) 8 Cal.4th 450, 501–505 [34 Cal.Rptr.2d 558, 882 P.2d 249].) Defendant contends the prosecution's remarks lessened its burden of proof by implying defendant was not entitled to be presumed innocent.

This contention lacks merit. In *People v. Goldberg* (1984) 161 Cal.App.3d 170, 189–190 [207 Cal.Rptr. 431], the Court of Appeal rejected a similar claim, noting that similar comments by the prosecutor in that case were merely rhetorical restatements of the law as reflected in section 1096 and CALJIC No. 2.90. As the Court of Appeal noted, "Once an otherwise properly instructed jury is told that the presumption of innocence obtains until guilt is proven, it is obvious that the jury cannot find the defendant guilty until and unless *they*, as the fact-finding body, conclude guilt was proven beyond a reasonable doubt." (*Goldberg, supra,* 161 Cal.App.3d at pp. 189–190, original italics.) We agree. Although we do not condone statements that appear to shift the burden of proof onto a defendant (as a defendant is entitled to the presumption of innocence until the contrary is found by the jury), the prosecutor here simply argued the jury should return a verdict in his favor based on the state of the evidence presented.

Defendant relies upon *U.S. v. Perlaza* (9th Cir. 2006) 439 F.3d 1149, 1169, in which the prosecutor argued to the jury, " '[The presumption of innocence], when you go back in the room right behind you, is going to vanish when you start deliberating. *And that's when the presumption of guilt is going to take over you. . . .*' " (Original italics.) The Ninth Circuit ruled the prosecutor's remark constituted misconduct, and that the trial court's curative instruction failed to correct its initial ratification of the prosecutor's argument when the court stated in the presence of the jury, " 'That's proper rebuttal. Go ahead. You are all right.' " (*Id.* at p. 1171, fn. 25.) *Perlaza,* which is not binding on us, is distinguishable as not only did that prosecutor make an incorrect statement of law (" 'presumption of guilt' "), but the error was compounded by the trial court's initial ratification of the misstatement (" '[y]ou are all right' "), and the Ninth Circuit ruled the curative instruction neither set forth the prosecutor's burden of persuasion (that is, proof beyond a reasonable doubt), nor clarified that the presumption of innocence " 'goes with the jury when it deliberates.' " (*Id.* at pp. 1171–1172 & fn. 25.) Although defendant here contends the prosecutor's argument (and the trial court's followup remarks) in his case failed to specify explicitly that the presumption of

innocence continued until jury deliberations, that concept was addressed adequately by CALJIC No. 2.90, which the trial court read to the jury. Moreover, the prosecutor here emphasized that he bore the burden of proof beyond a reasonable doubt, and defense counsel noted he had no burden of proof and argued the prosecutor had failed to meet his burden. The jury was not misled.

Defendant also relies on *People v. Hill* (1998) 17 Cal.4th 800, 831 [72 Cal.Rptr.2d 656, 952 P.2d 673], in which we concluded it was reasonably likely that the prosecutor's remark, " '*There has to be some evidence on which to base a [reasonable] doubt*' " (original italics), was understood by the jury to mean the defendant had the burden of producing evidence to demonstrate that a reasonable doubt existed. Although we reversed the verdict in *Hill*, that remark was but one of the many acts of prosecutorial misconduct and other errors that plagued that trial.

Even were we to assume the prosecutor committed misconduct, prejudice is lacking under either the state law (see *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) or the federal constitutional standard of review (see *Chapman, supra,* 386 U.S. at p. 24). Viewing the prosecutor's statements in the context of his entire argument, the jury was properly informed about the prosecutor's burden, and the evidence of defendant's guilt (notably, his own confession) was overwhelming.

### 6. *Cumulative error*

Defendant contends that if we do not conclude that any individual guilt phase error mandates reversal, the cumulative effect of the guilt phase errors requires reversal. We disagree. To the extent that there are a few instances in which we found or assumed the existence of error, we concluded that no prejudice resulted from any such error. Accordingly, the cumulative nature of the guilt phase errors, if any, does not lead us to conclude that defendant was denied a fair trial.

### C. *Penalty Phase Issues*

### 1. *Admission of photographs*

Defendant contends the trial court erred by "re-introduc[ing]" during the penalty phase the photographs it admitted into evidence during the guilt phase. During the penalty phase, the prosecutor did not introduce any new photographs but rather referenced the ones previously introduced, and the trial court instructed the jury that it could consider the evidence admitted during the entire trial.

██ Photographic evidence is generally admissible, just as all relevant evidence is admissible (unless excluded by the federal or state Constitution or by statute), and trial courts have broad discretion in determining relevance. (E.g., *D'Arcy, supra*, 48 Cal.4th at p. 298.) As we have noted repeatedly, the trial court's discretion to exclude photographs as unduly prejudicial during the penalty phase is even more circumscribed than admission of photographs during the guilt phase, as " ' "the sentencer is *expected* to subjectively weigh the evidence, and the prosecution is entitled to place the capital offense and the offender in a morally bad light." ' [Citation.]" (*Id.* at p. 299, original italics.)

As discussed, *ante*, we have reviewed the photographs, and found the trial court did not abuse its discretion in admitting the photographs during the guilt phase. With respect to the penalty phase, the photographs here graphically depicted the crime scene and the victims' wounds, and as such were relevant to the penalty determination as evidence of the circumstances of the crime. (See § 190.3, factor (a); see, e.g., *D'Arcy, supra*, 48 Cal.4th at pp. 298–299.) Accordingly, it was permissible for the jury to rely on those photographs during the penalty phase, and the trial court did not err in instructing the jury that it could consider the evidence admitted during the guilt phase.[25]

### 2. *Admission of evidence of uncharged violent criminal conduct*

Defendant contends the trial court erred by admitting evidence of uncharged violent criminal conduct. Over defense objection, the trial court permitted the prosecutor to introduce evidence that defendant stabbed his uncle; threatened a neighbor; chased someone down the street while wielding a stick; and displayed a knife while others fought.

██ Jurors may consider evidence of uncharged violent criminal conduct by defendant that involved the use or attempted use of force or violence, or express or implied threat to use force or violence, but only if they were convinced beyond a reasonable doubt that defendant had engaged in such activity.[26] (See, e.g., *People v. Wallace* (2008) 44 Cal.4th 1032, 1079 [81 Cal.Rptr.3d 651, 189 P.3d 911].) Although a trial court lacks the discretion to exclude all such evidence, it retains the traditional discretion to exclude specific evidence if it is misleading, cumulative, or unduly prejudicial. (*Ibid.*)

---

[25] To the extent defendant contends the photographs caused an alternate juror to become physically ill during defense counsel's penalty phase closing argument, the record does not disclose why the alternate juror became ill, but there is no indication the photographs caused the illness.

[26] Specifically, the trial court instructed the jury on the elements of assault with a deadly weapon, making terrorist threats, brandishing a deadly weapon, and battery. The trial court also instructed the jury on self-defense and attempt.

Defendant notes other jurisdictions have prohibited or otherwise limited the introduction of uncharged violent criminal conduct. (See *Cook v. State* (Ala. 1978) 369 So.2d 1251, 1257; *Provence v. State* (Fla. 1976) 337 So.2d 783, 786–787; *State v. McCormick* (1979) 272 Ind. 272 [397 N.E.2d 276]; *Scott v. State* (1983) 297 Md. 235 [465 A.2d 1126, 1132–1134]; *Commonwealth v. Hoss* (1971) 445 Pa. 98 [283 A.2d 58, 68–69]; *State v. Bartholomew* (1984) 101 Wn.2d 631 [683 P.2d 1079, 1082–1085].) As defendant concedes, however, we repeatedly have ruled there is no prohibition against such evidence in California.[27] (E.g., *People v. Gurule* (2002) 28 Cal.4th 557, 653–654 [123 Cal.Rptr.2d 345, 51 P.3d 224].) Defendant offers no persuasive reason to reexamine these prior decisions.

Defendant further contends evidence of this violent criminal activity was unduly prejudicial and misleading, and violated his constitutional rights to due process and to a fair and reliable penalty determination. Defendant fails to explain how any of the evidence was misleading, other than weakly suggesting the evidence wrongly portrayed him as a "dangerous knife wielding assassin." "Prejudice" in the context of Evidence Code section 352 is not synonymous with "damaging": it refers to evidence that poses an intolerable risk to the fairness of the proceedings or reliability of the outcome. (See *People v. Alexander* (2010) 49 Cal.4th 846, 904–905 [113 Cal.Rptr.3d 190, 235 P.3d 873].) Although the evidence of his violent criminal activity likely was damaging to defendant, he fails to demonstrate how it was *unduly prejudicial*—the inference that he was dangerous was entirely proper. Accordingly, the trial court did not abuse its discretion in admitting this evidence, and defendant's constitutional rights were not violated.

Defendant finally contends the prosecutor failed to prove beyond a reasonable doubt that his uncharged conduct rose to the level of violent criminal activity. "We review the record for 'substantial evidence from which a jury could conclude beyond a reasonable doubt that violent criminal activity occurred.' [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 194 [97 Cal.Rptr.3d 117, 211 P.3d 617] (*Carrington*).)

Defendant does not dispute that he stabbed his uncle, but rather contends he did so in self-defense, which would make his use of force lawful. Although the uncle's testimony supported defendant's claim of self-defense, other evidence indicated defendant was not in imminent danger, and that he

---

[27] Defendant's recitation of federal case law (see *Estelle v. McGuire* (1991) 502 U.S. 62 [116 L.Ed.2d 385, 112 S.Ct. 475]; *Spencer v. Texas* (1967) 385 U.S. 554 [17 L.Ed.2d 606, 87 S.Ct. 648]; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378; *Panzavecchia v. Wainwright* (5th Cir. 1981) 658 F.2d 337; *Murray v. Superintendent, Kentucky State Penitentiary* (6th Cir. 1981) 651 F.2d 451) is similarly unavailing.

stabbed his uncle out of anger. Moreover, the trial court instructed the jury with the elements of self-defense, which we presume it understood and applied. (See, e.g., *People v. Butler* (2009) 46 Cal.4th 847, 873 [95 Cal.Rptr.3d 376, 209 P.3d 596].)

Defendant similarly does not dispute saying that he would kill a neighboring family, but rather contends one of the neighbors testified that he was not afraid of defendant.[28] Another neighbor, however, did feel threatened, and reported defendant's statements to the police.

Defendant further does not dispute that he chased somebody down the street while wielding a stick. Although there was no evidence defendant actually struck this other person with the stick, the evidence supported the inference that he was attempting to do so.

Defendant finally does not dispute that he drew his knife while others fought. Brandishing a weapon may be committed by drawing or exhibiting a weapon in a rude, angry, or threatening manner. (§ 417, subd. (a)(1); e.g., *People v. Sanders* (1995) 11 Cal.4th 475, 542 [46 Cal.Rptr.2d 751, 905 P.2d 420].) A weapon need not be pointed at the victim to be threatening. (E.g., *Sanders, supra*, 11 Cal.4th at p. 502 [sufficient evidence when the defendant positioned a rifle at victim after a coperpetrator said, " 'Shoot him. Shoot him.' "].) "For purposes of the conduct which [section 417] is meant to deter, it is enough that the brandishing be in public, in the presence of the victim, where some third party happening along might get the idea that either the victim or brandisher need[s] help, or might think a brawl is in the making which he might join. The thrust of the offense is to deter the public exhibition of weapons in a context of potentially volatile confrontations." (*People v. McKinzie* (1986) 179 Cal.App.3d 789, 794 [224 Cal.Rptr. 891] [ruling victim's awareness of the weapon not required].) Although defendant did not join in the physical altercation, sufficient evidence was introduced that he participated in the argument giving rise to the fight and that he drew his knife in the context of the confrontation.

---

[28] In California, it is unlawful to "willfully threaten[] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety." (§ 422.)

### 3. *Admission of victim impact evidence*

Defendant contends the trial court erred by admitting victim impact evidence that was irrelevant, cumulative, unduly prejudicial, and inflammatory.

 Unless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim is relevant and admissible under section 190.3, factor (a), as a circumstance of the crime. (E.g., *People v. Burney* (2009) 47 Cal.4th 203, 258 [97 Cal.Rptr.3d 348, 212 P.3d 639] (*Burney*).) The federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair. (*Burney*, at p. 258, citing *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].)

Over defendant's objection to the victim impact evidence, six relatives of the three victims testified over the course of two days about the impact the murders had on their lives. After the first witness testified, defendant objected to her testimony and moved for a mistrial, which the trial court denied. In addition, over defendant's objections, the jury viewed three videotapes depicting photographs of the victims.

On appeal, defendant first contends the trial court erred by admitting the videotapes. The trial court ruled the videotapes were admissible, but ordered the prosecutor to remove the audio track, which contained sentimental music.

We have viewed the three videotapes. The videotape for Powalka is four minutes in length; Amanda's is five minutes long; and Corina's is seven minutes long. There is no sound on any of the videotapes. Each videotape depicts a series of photographs of the victims; in some photographs, they are alone, in others they are with persons who are presumably friends or family members. The photographs depict the young women engaging in a variety of activities or enjoying various holidays. Corina's videotape also includes a photograph of what appears to be a school display commemorating her being named student of the month.

Citing *Salazar v. State* (Tex.Crim.App. 2002) 90 S.W.3d 330, defendant contends these videotapes amounted to inadmissible "photographic eulogies." Although we have acknowledged the constitutional issues implicated by *Salazar*, it is not binding on us. (E.g., *People v. Kelly* (2007) 42 Cal.4th 763, 797–799 [68 Cal.Rptr.3d 531, 171 P.3d 548] (*Kelly*).) In *Kelly*, for example, this court ruled the trial court did not abuse its discretion in admitting an approximately 20-minute videotape containing a montage of photographs and video clips from the life (from her infancy until shortly before her death) of

the victim, a 19-year-old woman. (*Id.* at p. 796.) The videotape in *Kelly* was narrated by the victim's mother and soft music played in the background. (*Ibid.*)

Like the videotape in *Kelly*, the videotapes here supplemented but did not duplicate the other victim impact evidence, and properly humanized the three young women. (See *Kelly, supra*, 42 Cal.4th at p. 797.) Also as in *Kelly*, the videotapes did not emphasize any particular aspects of the young women's lives; they did overwhelmingly depict them in childhood, but the victims were, after all, still young when defendant killed them. (See *ibid.*) The combined length of these three videotapes was less than the one videotape admitted in *Kelly.* Notably, unlike the videotape in *Kelly*, none of these videotapes had a soundtrack. Accordingly, the trial court did not err in admitting these videotapes; we are satisfied the videotapes did not invite a purely irrational response from the jury.

Defendant next contends the victim impact evidence was unnecessarily cumulative and that the trial court abused its discretion in denying his motion for a mistrial. After the prosecution's first victim impact witness, Frankie Sanderson (Powalka's mother), testified, defendant objected and moved for a mistrial, arguing in essence that her testimony was cumulative, as she testified for over 30 minutes, and that some of her testimony was irrelevant, as it was not proper victim impact evidence. The trial court overruled defendant's objection and denied the motion for a mistrial, but advised the prosecutor to be more succinct with other witnesses. The trial court indicated it did not want to "have everybody in the audience like they are, crying and teary-eyed like they are . . . ."

Defendant's contention lacks merit, as he fails to specify exactly what evidence was cumulative. Although the trial court cautioned the prosecutor to be more succinct after Sanderson testified, it did not abuse its discretion in denying defendant's motion for a mistrial, as Sanderson's testimony, although evocative, did not invite a purely irrational response from the jury.

Defendant quotes *Cargle v. State* (1995) 1995 OK CR 77 [909 P.2d 806, 830], in which the Oklahoma Court of Criminal Appeals stated, "The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a 'reasoned moral response' to the question whether a defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process," and thus contends the jury here was overly exposed to the emotional aspects of the victims' deaths. To bolster this argument, defendant notes that, after Sanderson testified, the court declared a brief recess. During the break, an audience member pulled out his wallet, approached the bailiff in the elevator, and said, "How much money would it

cost for you to leave for five minutes?" Believing the audience member was expressing a desire to harm defendant, the bailiff responded, "You don't have enough money." As the audience member was about to reply, the bailiff said, "You don't say anything else now." Also in the elevator were Sanderson, her friend, and a juror. Outside the presence of the other jurors, the trial court and counsel questioned the juror who was in the elevator. The juror acknowledged hearing the bailiff, but did not hear what the audience member had said. The juror was not fazed by the exchange, and said it would not affect her decisionmaking ability.

As additional evidence of the emotional nature of the victim impact evidence, defendant also notes that while testifying, Nora (Corina's mother) at one point said she was "very sad" and felt "very faint." The prosecutor offered to stop, but Nora requested a minute to compose herself, and then continued to testify.

Defendant's contention lacks merit, as *Cargle* is not binding on us; moreover, the trial court was well aware of the emotional impact that the testimony was having on the audience members. (See, e.g., *Prince, supra*, 40 Cal.4th at pp. 1289–1291 [urging trial courts to monitor the effect of emotionally laden evidence on the jury and audience members and make a careful record of their observations].) Given the emotional reaction by audience members to Sanderson's testimony, the trial court took proper remedial steps to control the tone of the victim impact testimony, and the record before us discloses no further problems.[29] (See, e.g., *People v. Jurado* (2006) 38 Cal.4th 72, 132–134 [41 Cal.Rptr.3d 319, 131 P.3d 400] [finding no error when testimony from multiple family members caused some jurors to cry].) Consequently, neither the type nor the amount of evidence invited a purely irrational response or otherwise rendered defendant's trial fundamentally unfair. (See, e.g., *Burney, supra*, 47 Cal.4th at p. 258.)

Defendant next contends the testimony regarding Powalka's funeral and cremation was too remote from defendant's actions to be relevant. As we have noted, however, evidence of a victim's family's grief at funeral services, and of the condition of the victim's body, is admissible and relevant. (See, e.g., *People v. Harris* (2005) 37 Cal.4th 310, 351–352 [33 Cal.Rptr.3d 509, 118 P.3d 545] [photographs of the victim's gravesite were relevant to the effect the murder had on her family].) To the extent defendant contends the testimony about Powalka's open-casket funeral that the jury *heard* was

---

[29] After Sanderson testified, the trial court properly instructed the jury, "You can't probably help notice that some of the testimony will affect people in the audience and it's understandable, and you may see people that are teary-eyed, and they probably can't help it. Again, the decision can't be based upon the reaction of people in the audience. It has to be based upon the evidence presented in the witness stand."

unduly prejudicial, we note the jury already had *viewed* numerous photographs of the crime scene and autopsies.

Defendant also contends Sanderson's testimony regarding her beliefs concerning the effect that Powalka's murder had on her and her mother's health was unduly speculative and prejudicial. To the extent this testimony constituted improper speculation, defendant forfeited this claim by failing to object and request that the trial court instruct the jury to ignore it. (*Carrington, supra*, 47 Cal.4th at p. 197.) In any event, there is no reasonable possibility that this error affected the penalty phase verdict. (See, e.g., *People v. Gonzalez* (2006) 38 Cal.4th 932, 960–961 [44 Cal.Rptr.3d 237, 135 P.3d 649].)

Defendant further contends Sanderson improperly testified about the effect of waiting for the trial. Sanderson testified that the trial brought "closure to a chapter, that finally the end is in sight," but that the years between Powalka's death and the trial were "hell" because "not a day that doesn't go by that I don't think of her." After Sanderson's testimony, defense counsel, as part of the mistrial motion, argued this testimony, as well as the testimony about her and her mother's deteriorating health, implied defendant was to blame for the delay between the killings and the trial. Although the prosecutor denied that was his intent in asking those questions, the trial court agreed with defense counsel that the jury understood Sanderson blamed defendant for the delays, but the trial court nonetheless denied the motion for a mistrial. We already have concluded the trial court did not abuse its discretion in denying defendant's motion for a mistrial, and this additional claimed basis for a mistrial does not alter the conclusion that Sanderson's testimony did not provoke a purely irrational response. Moreover, the prosecutor heeded the trial court's warning and did not question other witnesses about this subject.

Defendant further contends that Nora's testimony, which included her emotional descriptions of her suicide attempt, hospitalizations, and her nearly fainting while testifying, was "unduly prejudicial and totally unnecessary." The devastating effect of Corina's death on Nora plainly was relevant victim impact evidence. The testimony was emotional at times, but emotional testimony is not necessarily inflammatory. (See *People v. Verdugo* (2010) 50 Cal.4th 263, 298–299 [113 Cal.Rptr.3d 803, 236 P.3d 1035] [finding no error when victim's mother cried while testifying].) Although Nora's husband and Corina's stepfather, Richard, also testified about how Corina's murder affected their family, Nora's and Richard's testimonies contrary to defendant's argument, were not unduly cumulative of each other. Richard testified primarily about what type of person Corina was, his relationship with her, and how he learned of her death. Although Richard did testify about the effect of Corina's death on their family, he also testified how the change in Nora caused by Corina's death affected him, which was a subject about which Nora did not testify.

Finally, contrary to defendant's contention, the overall number of victim impact witnesses was not prejudicial. Although six family members did testify, given that there were three victims, an average of two witnesses per victim is not excessive. (See, e.g., *Brady, supra*, 50 Cal.4th at pp. 567–573 [no error when 60 witnesses over 12 days testified, including eight witnesses who were friends, relatives, or coworkers of the capital crime victim].) Although trial courts must continue to exercise their discretion under Evidence Code section 352 to exclude unduly cumulative evidence, the trial court here was aware of these concerns and did not abuse its discretion in admitting the evidence. (See *Brady*, at p. 583.)

### 4. *Refusal to instruct jury on age as a mitigating factor*

Defendant, who had turned 18 only a month before the murders, contends the trial court erred by refusing to instruct the jury that, under factor (i) of section 190.3, his age could be considered only as a mitigating factor. The trial court instructed the jury that defendant's age could be considered as a factor in determining the sentence, but declined to specify whether it was an aggravating or mitigating factor. During closing arguments, defendant argued his age and immaturity were mitigating factors.

This contention lacks merit. In *Burney, supra*, 47 Cal.4th at pages 257–258, we ruled the trial court did not err in refusing the defendant's request to list his age (18) as a specific example of a mitigating factor. Although the trial court in *Burney* did instruct the jury that the defendant's age could not be considered as an aggravating factor, it was not constitutionally required to do so. (See *ibid.*) The trial court here properly instructed the jury that, under factor (k) of section 190.3, it could consider "[a]ny other circumstance which extenuates the gravity of the crime," which would include defendant's age.

Defendant nonetheless contends the high court's decision in *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183] compels us to revisit whether the trial court should have instructed the jury that his age could have been considered only as a mitigating factor. We disagree. *Roper* concluded the imposition of the death penalty for crimes committed while the defendant was under the age of 18 constituted cruel and unusual punishment under the federal Constitution; it did not address whether an offender's youthfulness is an aggravating or a mitigating factor. As defendant acknowledges, we rejected a similar argument in *People v. Brown* (2003) 31 Cal.4th 518, 564–565 [3 Cal.Rptr.3d 145, 73 P.3d 1137], concluding the trial court did not err in rejecting the 19-year-old defendant's request to instruct the jury that a person under the age of 18 is not subject to the death penalty.

Defendant's contrary argument notwithstanding, nothing in *Roper* undermined the rationale of *Brown*.[30]

### 5. *Cumulative error*

As with defendant's guilt phase cumulative error claim, defendant contends that if we do not conclude that any individual penalty phase error mandates reversal, the cumulative effect of the penalty phase errors requires reversal. We disagree. To the extent that there are a few instances in which we found or assumed the existence of error, we concluded that no prejudice resulted. We reach the same conclusion after considering the errors' cumulative effect.

### D. *General Challenges to California's Death Penalty Scheme*

Defendant raises a number of constitutional challenges to California's death penalty law, all of which we have repeatedly rejected, and he offers no persuasive reason to reexamine these prior decisions.[31] Thus, we again hold:

The death penalty is not inherently cruel or unusual punishment. (E.g., *People v. Thompson* (2010) 49 Cal.4th 79, 144 [109 Cal.Rptr.3d 549, 231 P.3d 289] (*Thompson*).)

The circumstances and pace of California's executions do not make the death penalty arbitrary or unconstitutional. (E.g., *People v. Redd* (2010) 48 Cal.4th 691, 758–759 [108 Cal.Rptr.3d 192, 229 P.3d 101].)

California's death penalty statute is not vague and overbroad, and does adequately narrow the class of death-eligible offenders. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; e.g., *Martinez, supra,* 47 Cal.4th at p. 967; *People v. Lewis* (2008) 43 Cal.4th 415, 515–516 [75 Cal.Rptr.3d 588, 181 P.3d 947]; *People v. Cook* (2006) 39 Cal.4th 566, 617 [47 Cal.Rptr.3d 22, 139 P.3d 492]; *People v. Chatman* (2006) 38 Cal.4th 344, 394–395 [42 Cal.Rptr.3d 621, 133 P.3d 534]; *People v. Vieira* (2005) 35 Cal.4th 264, 303–304 [25 Cal.Rptr.3d 337, 106 P.3d 990] (*Vieira*); *Benavides, supra,* 35 Cal.4th at p. 104; *San Nicolas, supra,* 34 Cal.4th at pp. 676–677; see *People v. Saille* (1991) 54 Cal.3d 1103, 1116 [2 Cal.Rptr.2d 364, 820 P.2d 588].)

---

[30] Moreover, the enactment of section 190.5, which also prohibits the imposition of the death penalty for crimes committed while the offender is under the age of 18, predated both *Brown* and *Roper; Roper* did not alter how California sought and imposed the death penalty, and thus could not have undermined *Brown*.

[31] Defendant incorporates by reference the challenges to California's death penalty scheme raised in *People v. Stanley* (2006) 39 Cal.4th 913, 962–968 [47 Cal.Rptr.3d 420, 140 P.3d 736] (*Stanley*). For the reasons stated therein, we continue to reject these arguments.

The death penalty law does not require that the jury be given instructions on the burden of proof or the standard of proof for finding the existence of aggravating factors (except for other uncharged violent criminal conduct), for finding that aggravating factors outweigh mitigating factors, or for finding that death is the appropriate penalty. (E.g., *People v. Collins* (2010) 49 Cal.4th 175, 260–261 [110 Cal.Rptr.3d 384, 232 P.3d 32] (*Collins*).) The United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738], and *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] have not altered these conclusions. (E.g., *Collins, supra,* 49 Cal.4th at pp. 260–261; *Thompson, supra,* 49 Cal.4th at p. 134.)

The federal Constitution does not require that jurors agree unanimously on each instance of uncharged violent criminal conduct. (*People v. Bunyard* (2009) 45 Cal.4th 836, 861 [89 Cal.Rptr.3d 264, 200 P.3d 879].) *Apprendi* and its progeny do not alter that conclusion. (*Bunyard,* at p. 861.)

Written or specific findings by the jury regarding aggravating factors are not constitutionally required. (E.g., *Collins, supra,* 49 Cal.4th at p. 261.) Equal protection does not require that capital defendants be afforded the same sentence review afforded other felons sentenced under the determinate sentencing law. (*Ibid.*)

The prosecutorial discretion of individual district attorneys to select in which eligible cases the death penalty will be sought is not evidence of an arbitrary and capricious death penalty system. (See, e.g., *People v. Bennett* (2009) 45 Cal.4th 577, 629 [88 Cal.Rptr.3d 131, 199 P.3d 535].) Contrary to defendant's contention, the voting rights case *Bush v. Gore* (2000) 531 U.S. 98 [148 L.Ed.2d 388, 121 S.Ct. 525] does not compel a different result. (See, e.g., *Bennett,* at p. 629, fn. 19.)

A trial court is not required to instruct the jury that the absence of mitigating factors is not itself an aggravating factor. (See, e.g., *Vieira, supra,* 35 Cal.4th at p. 299.) Similarly, a trial court is not required to instruct the jury that a single mitigating factor may be sufficient to outweigh all aggravating factors. (See, e.g., *People v. Davis* (2009) 46 Cal.4th 539, 621–623 [94 Cal.Rptr.3d 322, 208 P.3d 78] (*Davis*).)

The sentencing factors in section 190.3 do not fail to adequately channel or limit the sentencer's discretion in choosing death over life without the possibility of parole. (*Stanley, supra,* 39 Cal.4th at p. 967.)

Comparative intercase proportionality review is not constitutionally required. (E.g., *Collins, supra,* 49 Cal.4th at p. 261; see *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871].)

The delay between sentence and execution does not violate the federal or state Constitution. (See, e.g., *Davis, supra,* 46 Cal.4th at p. 628.)

The use of restrictive adjectives such as "extreme" and "substantial" in the list of potential mitigating factors does not act as a barrier to consideration of mitigating evidence. (E.g., *Thompson, supra,* 49 Cal.4th at p. 144.)

The trial court was not constitutionally required to inform the jury that certain sentencing factors are relevant only in mitigation. (E.g., *Ervine, supra,* 47 Cal.4th at p. 810.)

California's assertedly regular use of the death penalty does not violate international laws or norms. (E.g., *People v. Dykes* (2009) 46 Cal.4th 731, 820 [95 Cal.Rptr.3d 78, 209 P.3d 1].)

### III. Conclusion

The judgment is affirmed.

Kennard, Acting C. J., Baxter, J., Werdegar, J., Chin, J., Corrigan, J., and George, J.,[*] concurred.

Appellant's petition for a rehearing was denied March 16, 2011.

---

[*]Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.