Filed 3/26/14  P. v. Jefferson CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARCUS R. JEFFERSON,<br><br>    Defendant and Appellant. | D063977<br><br><br>(Super. Ct. No. SCE326326) |

APPEAL from a judgment of the Superior Court of San Diego County, Allan J. Preckel, Judge.  Affirmed in part and reversed in part.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Andrew Mestman and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Defendant of burglary and several other offenses that stemmed from his flight from the police and resisting arrest.  On appeal, he contends the judgment

must be reversed because the prosecution improperly told the jury that he "shed" the presumption of innocence when he took the witness stand and testified. He also contends the prosecution's reference to him as a "felon" in rebuttal closing argument was a reference to his past convictions and was an impermissible attempt to use the convictions as evidence of his guilt. He finally contends his convictions for possession of burglary tools, based on possession of credit cards, and for attempting to take an officer's Taser should be reversed because of insufficient evidence.

Although we agree that the prosecution's discussion of the presumption of innocence was objectively improper, the error was harmless. We further conclude the prosecution's reference to Defendant as a "felon" was not a reference to his past convictions and did not violate his rights. We next conclude substantial evidence supports the jury's verdict on the charge related to the Taser. Finally, we conclude credit or debit cards do not meet the statutory definition of burglary tools. We affirm the judgment in part and reverse it in part.

FACTUAL AND PROCEDURAL BACKGROUND

On December 19, 2012, Defendant went to the Budget Inn in El Cajon, California, to collect money a hotel resident owed him. Ignacio Rubio, the hotel's manager, confronted Defendant and escorted him off the property. Defendant returned later that night and entered the locked room of long-term resident Richard Randall, who was asleep inside. Randall awoke to find Defendant standing nearby and holding a blanket. Randall screamed, and Defendant dropped the blanket, fled the room, and went into the parking

2

lot.  Rubio heard the disturbance, called 911, and again escorted Defendant off the property.  By the time the police arrived, Defendant was no longer at the scene and was not apprehended that night.

Upon surveying his room, Randall discovered that his wallet and the $80 it contained were missing.  His cell phone, which he had left on a table, was at the foot of his bed along with three credit or debit cards, none of which belonged to him.  Two of the cards bore Defendant's name, and the third bore a stranger's name.

Randall also found the window to his room was closed, had not been broken, and the door lock had not visibly been tampered with.  Before he went to sleep that night, he did not engage the dead bolt, and instead locked only the lock on the doorknob.  Using his own credit card, Randall was able to gain access to the room by inserting the card into the bottom portion of the door lock.

The next evening, December 20th, Rubio discovered Defendant near the window of another room at the hotel.  Defendant fled the hotel property, and Rubio called the police. El Cajon Police Officer Jeannie Johns-Davis heard a radio dispatch of a suspect matching the description of the hotel burglar from the previous night and began searching the area.  Officer Johns-Davis then saw Defendant sprinting down a street and began chasing him through several backyards.

Officer Tabitha Latinette, who had joined the foot pursuit, was the first officer to locate Defendant as he came out of the shadows from the side of a house and stated, "Over here, over here.  It is me."  Officer Latinette repeatedly ordered him to show his

3

hands and to get down on the ground. Defendant did not comply immediately, put both his hands up, and began walking toward Officer Latinette, stating "Help me. Help me, they are trying to kill me." Defendant then sat down on a patio love seat, ignoring Officer Latinette's commands to lie on the ground. Her partner, Officer Steven Breakall, and Officer Johns-Davis followed the sound of her voice to her location.

With all three officers present, Defendant continued to ignore commands to lie on the ground. Together, the three officers attempted to take Defendant into custody. Officer Breakall grabbed Defendant's left wrist and pushed his shoulder toward the ground while Officer Johns-Davis did the same on Defendant's right side. As soon as the officers touched him, he began to resist, and they were unable to handcuff him. When Defendant ignored commands to stop resisting, Officer Breakall kneed him three times in the ribs. Defendant stood up with Officer Latinette on his back, placed his hand on Officer Breakall's gun, and began pulling it. Officer Johns-Davis heard Officer Breakall yell, "He is going for my gun." Officer Breakall twisted away, and Defendant lost his grasp on the gun as Officer Johns-Davis punched him several times in the groin.

Defendant and the three officers then fell to the ground, and the struggle continued. Because Defendant was on top of Officer Latinette, Officer Breakall pulled Defendant towards him. As Defendant landed on top of him, Officer Breakall placed him in a carotid restraint. Defendant began striking backwards at Officer Breakall, hitting him approximately 15 times in the forehead with his hand. Defendant also punched Officer Latinette in the face as she tried to control his left arm. Defendant then grabbed

4

her shirt and vest, pulled her towards him, grabbed her Taser and pulled it towards himself. Defendant's hand then moved to her magazine pouch and keys, which Officer Latinette believed was an attempt to reach for her gun. She punched Defendant in the face between 15 and 20 times.

At some point in the struggle, Defendant grabbed Officer Latinette's flashlight, which was nearby on the ground. As Defendant began moving the flashlight towards Officer Breakall's head, Officer Latinette grabbed it away from him, and Defendant's empty hand struck Officer Breakall's forehead.

Officer Breakall eventually cut off his air supply, and Defendant's combativeness slowed. By this time, other officers responded and took Defendant into custody.

At trial, Defendant testified that he went to the Budget Inn on December 19th to collect a $10 debt. As he passed Randall's room, he noticed food inside the room and went in through the open door. After grabbing food and a cell phone, he testified he returned a second time to take Randall's wallet and blanket. This time, Randall awoke and began screaming.

According to Defendant, he returned to the hotel the next day to again collect the debt. Before doing so, he used methamphetamine. He knocked on the door of a room in which he had once stayed, wanting to use the telephone "or something." When Rubio confronted him, Defendant ran. As he ran, he felt threatened and believed certain unknown persons were trying to kill him. In fear for his life, he knocked on a couple of doors and asked the inhabitants if they would call the police.

5

Defendant then followed an unknown person into a backyard because he believed he recognized the person. The person disappeared, and Defendant sat in the backyard for several minutes. When Defendant saw an officer, he hailed her. She told him to sit down and put his hands up, and he did exactly what she said. Defendant testified he attempted to lie on the ground, but because of a stomach ailment, he was not as fast as he once was and did not have a chance to comply with any additional orders. Before he knew it, he was tackled from behind and beaten up. He testified to trying to protect himself, but denied swinging at the officers. He denied trying to take any of the officers' weapons.

A San Diego County jury found Defendant guilty of assault on a peace officer with force likely to produce great bodily injury (count 1; Pen. Code, § 245, subd. (c)),[1] attempting to take a weapon other than a firearm while resisting a peace officer (count 3; §§ 664/148, subd. (b)), resisting an executive officer (count 6; § 69), burglary of an inhabited dwelling place while another person was present (count 7; §§ 459/460, 667.5, subd. (c)(21)), and possession of burglary tools (count 9; § 466). The jury found him not guilty of two counts of battery against a peace officer with injury (counts 4 & 5; § 243, subd. (c)(2)) and attempted burglary (count 8; §§ 459/460). The jury was unable to reach a verdict as to count 2, which charged that Defendant intentionally attempted to take a firearm from a peace officer (§ 148, subd. (d)), and the court declared a mistrial as to that count. Defendant admitted he had suffered two prior prison terms, and the court sentenced him to eight years four months in prison. (CT 228-229)!

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

6

## DISCUSSION

### *I. The Prosecution's Reference to Defendant as a "Felon"*

Defendant argues the prosecution violated his Sixth Amendment rights when it argued the jury should rely on Defendant's prior felonies to find him guilty of the charged offenses.[2]  We conclude the prosecution did not err.

In its rebuttal closing argument, the prosecution told the jury the following:

> "Who told you the truth and who didn't?  Who has got everything to gain by throwing defendant dust in your eyes from the testimony of the witness stand?  Who lied to you?  Which admitted burglar felon lied to you?
>
> "The man that would go twice, twice into a sleeping man's room. Not just stealing once, but going in to steal again.  And those cards are found on the bed, because he was going . . . through his room, inside the closet to get that man's blanket, the one that his grandmother made him 40 years ago; to satisfy his needs.
>
> "If he's got needs, because that is the way it is for survival to satisfy them at everybody else's expense.  Don't let him satisfy his needs to be acquitted at the expense of the truth, because the truth here is this man is a felon.  He's a thief.  He's going to fight with police officers to get away."

The prosecution's argument contains two references to Defendant as a felon. Defendant concedes the first reference, which appears in the first paragraph above, was not improper because the prosecution used the term in reference to Defendant's credibility and potentially lying to the jury.  However, he argues the second reference, in the third

---

[2]     As an initial matter, we briefly address the People's contention that Defendant forfeited various issues because his counsel did not object during trial.  We exercise our discretion and consider the issues the People argue are forfeited.  (See *People v. McCullough* (2013) 56 Cal.4th 589, 593.)

7

paragraph above, "cannot reasonably be construed as anything other than an argument that the jury should find [Defendant] guilty of the charges . . . because he is a convicted felon." We are not persuaded. When Defendant admitted on the witness stand that he committed the charged burglary offense--a felony--he admitted entering an inhabited hotel room twice with the specific intent to steal food and money. The prosecution's second reference could reasonably be understood to refer to Defendant's status as a felon at the time of trial based on his own admission to having committed a felony. Thus, the prosecution did not rely on *past* convictions, but Defendant's admission to a contemporaneously-charged felony offense. We find no fault with the prosecution referring to Defendant as a felon in this context.

## II. *The Prosecution's Discussion of the Presumption of Innocence*

In its closing argument, the prosecution referenced the presumption of innocence, which it argued Defendant "shed . . . when he took the [witness] stand." Defendant contends this argument violated his due process rights. Although we agree the argument was improper, we conclude the court's jury instructions cured any violation, which was harmless considering the evidence at trial.

"A prosecutor's conduct violates the federal Constitution when it infects the trial with unfairness, and violates state law if it involves the use of deceptive or reprehensible methods of persuasion." (*People v. Booker* (2011) 51 Cal.4th 141, 184.) "When the claim focuses on the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an

8

objectionable fashion." (*Id.* at pp. 184-185.) "A defendant is presumed innocent until proven guilty, and the government has the burden to prove guilt, beyond a reasonable doubt, as to each element of each charged offense." (*Id.* at p. 185.)

In its rebuttal closing argument, the prosecution stated:

"You are presumed innocent. You get all of the benefits of it, but when you take the stand, you are treated just like anybody else. That presumption fades away. You must testify and be assessed at the same standards.

"Police officers are judged [by] the same standard as any other witnesses, so are [defendants]. All witnesses are judged the same. He gets no benefit because he is the accused. He shed that when he took the stand."

Defendant contends "the prosecutor expressly argued that once [Defendant] testified on his own behalf he was no longer entitled to the presumption of innocence." Although we do not agree the prosecution intended to argue that Defendant was no longer entitled to the presumption of innocence simply because he testified on his own behalf, there was a reasonable likelihood the jury could have construed the prosecution's language in this objectionable fashion. In context, it appears the prosecution attempted to argue Defendant's testimony was not entitled to a heightened veracity standard simply because he chose to testify at trial. However, once the prosecution argued Defendant "shed" the presumption of innocence "when he took the stand," this language objectively conveyed the incorrect message that Defendant was no longer entitled to the presumption of innocence.

9

We find *People v. Booker* distinguishable because the Supreme Court held the prosecution had correctly conveyed the state of the law. (*People v. Booker*, *supra*, 51 Cal.4th at p. 185.) There, the prosecution told the jury, " 'The defendant was presumed innocent *until the contrary was shown. That presumption should have left many days ago.* He doesn't stay presumed innocent.' " (*Id.* at p. 183, italics added.) Thus, the prosecutor simply argued that, although the defendant was initially presumed innocent, the prosecution had met its burden and overcome that presumption. In the present case, however, the prosecution conveyed the impression that Defendant was not entitled to the presumption of innocence when he took the witness stand and testified. The prosecution did not argue it had met its burden or overcome the presumption with evidence. This statement was materially different than the one in *Booker*, and it was not a similar restatement of the law.

The foregoing notwithstanding, prejudice is absent under either state law (see *People v. Watson* (1956) 46 Cal.2d 818, 836) or the federal constitutional standard (see *Chapman v. California* (1967) 386 U.S. 18, 24). The trial court addressed the presumption of innocence when it read CALCRIM No. 220 to the jury, specifically instructing: "The defendant in a criminal case is presumed to be innocent. This presumption requires that the People proved a defendant guilty beyond a reasonable doubt." The jury was properly informed about the prosecution's burden.

Moreover, the evidence of Defendant's guilt--most notably, his own confession on the witness stand to the most serious charge of burglary--was strong. First, Defendant

10

admitted to the burglary charge when he testified. Further, as we explain separately below, the evidence supports the guilty verdict on the section 148, subdivision (b), charge for attempting to take Officer Latinette's Taser.

Moreover, the evidence strongly supports the guilty verdict on the section 245, subdivision (c), charge for assaulting Officer Breakall with force likely to produce great bodily injury. Two officers testified that Defendant grabbed a nearby metal flashlight and attempted to strike Officer Breakall in the head with it. The only reason he was not successful was Officer Latinette's quick action in taking the flashlight away from Defendant as he swung it toward Officer Breakall's head with such momentum that Defendant's empty hand struck the officer's head immediately after he was disarmed. Defendant exhibited deliberate intent to strike the officer in the head with the flashlight. These facts were sufficient to support the jury's verdict on this charge.

As for Defendant's contention that the officers used excessive force to effect his arrest, the evidence supports a finding that the officers did not use excessive force. Although Defendant contends he did not use force or actively resist arrest, the testimony at trial showed he did not cooperate with the officers and then actively resisted their efforts to get him on the ground for handcuffing. First, he did not comply with the officers' commands to lie on the ground. Second, once the officers moved in and attempted to make him lie on the ground for handcuffing, he tensed his body, began to resist being placed on the ground, and began to actively fight them. The officers' resulting use of force was in response to Defendant's active resistance and combativeness.

11

Substantial evidence supports the jury's guilty verdict on the section 69 charge for resisting arrest with force.

### III. *The Burglary Tool Conviction*

The jury convicted Defendant of one count of possession of burglary tools in violation of section 466. The evidence on this charge included (1) the three credit cards (two of which bore Defendant's name) Randall found in his room after the burglary and (2) Randall's testimony that he was able to open his locked hotel room door with a credit card. Defendant contends credit cards do not meet the statutory definition of burglary tools and there was insufficient evidence to sustain the conviction for possession of burglary tools. We agree.

Section 466 provides in pertinent part: "Every person having upon him or her in his or her possession a picklock, crow, keybit, crowbar, screwdriver, vise grip pliers, water-pump pliers, slidehammer, slim jim, tension bar, lock pick gun, tubular lock pick, bump key, floor-safe door puller, master key, ceramic or porcelain spark plug chips or pieces, or other instrument or tool with intent feloniously to break or enter into any building . . . is guilty of a misdemeanor." In the alternative, section 466 makes it a misdemeanor to "knowingly make or alter, or . . . attempt to make or alter, any key or other instrument named above so that the same will fit or open the lock of a building . . . ." "[T]o sustain a conviction for possession of burglary tools in violation of section 466, the prosecution must establish three elements: (1) possession by the defendant; (2) of tools within the purview of the statute; (3) with the intent to use the

12

tools for the felonious purposes of breaking or entering." (*People v. Southard* (2007) 152 Cal.App.4th 1079, 1084-1085.)

"When reviewing the sufficiency of evidence to support a criminal conviction, we ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] We view the whole record in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence to determine whether the record discloses substantial evidence. [Citations.] 'Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it.' " (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245.)

The most recent case in California to consider the breadth of section 466 is *People v. Diaz* (2012) 207 Cal.App.4th 396, in which the court considered whether a plastic bag that contained latex gloves qualified as a burglary tool. After detailing the statute's history and considering the case law interpreting it, the court concluded section 466 "is limited to instruments and tools used to break into or gain access to property in a manner similar to using items enumerated in section 466. That the perpetrator breaks into or enters property, or attempts to do so, *and* happens to have access to a tool that may be used in the course of the burglary is not enough. The tool must be for the purpose of breaking, entering, or otherwise gaining access to the victim's property. Nor is it enough that a common implement may be used for breaking and entering, given the Legislature

13

itself has specified its intent was 'to add only ceramic or porcelain spark plug chips or pieces, not other common objects such as rocks or pieces of metal that can be used to break windows, to the list of burglary tools in Section 466 of the Penal Code.' " (*Diaz*, 207 Cal.App.4th at p. 404.) The court noted that "[w]hen the Legislature added 'bump key' to the list of items in 2008 [citation], legislative analyses noted that 'devices *similar to listed burglary tools* would likely be considered a burglary tool,' and '[a]ppellate decisions have held that a device is a burglary tool *if it is similar in design and application to a burglary tool specifically listed . . . .*' " (*Id.* at p. 404, fn. 2.) There was no evidence the defendant had used the latex gloves in any manner, and the police found the gloves in the backyard of the home the defendant burglarized. (*Id.* at p. 399.) Furthermore, the gloves were not similar in design or used in a manner similar to any of the items listed in section 466. (*Diaz,* at p. 404.) The court held that the latex gloves in *Diaz* did not meet the statutory definition of burglary tools. (*Ibid.*)

Although the jury could have drawn the reasonable inference that Defendant used one or more of the credit cards to enter Randall's room, Defendant's use of the cards would not subject him to penalty under section 466 unless the cards meet the statutory definition for burglary tools. As *Diaz* explains, section 466 enumerates a limited universe of items that qualify, and other unlisted items may qualify if they are similar in design and application to the burglary tools the Legislature specifically listed. Citing only a Montana state case from 1959, the People contend the cards "were of a similar

14

genus as the other items listed in the statute. . . . [They] were intended to unlock or pry open a door, which is precisely what [Defendant] did with them."

We conclude credit or debit cards are not similar to any of the items listed in section 466 and do not qualify as burglary tools. Although these cards can be used to pry open locked doors, so can a large number of other items with a flat surface. However, credit and debit cards are not manufactured for the purpose of prying or unlocking doors or to function in a manner similar to any of the items in section 466. Our holding is in line with the statute's limitation of the universe of items that qualify as burglary tools. We note the Legislature excluded rocks or other metal objects that could be used to break windows when it added ceramic spark plug pieces to the statute (see *Diaz*, *supra*, 207 Cal.App.4th at p. 404), even though rocks can break windows in the same manner as spark plug pieces. Likewise, although credit cards can be used to pry open locked doors, they are not manufactured to function as pry tools or lock-picking implements.

In essence, the People contend an item qualifies as a burglary tool if the burglar used or subjectively intended to use the item to gain entry to a structure. However, this argument ignores whether the item's original purpose or function is similar to those in the statute. Were we to sanction the People's position, many more ordinary items would qualify as burglary tools if the burglar subjectively intended to use them in a manner similar to the items specifically listed in section 466 regardless of their original purpose. Thus, for example, using a butter knife, spatula, or any other unlisted flat-surfaced item to open a locked door would become punishable under section 466 if a particular burglar

15

decided to use these items. The result of the People's position would undermine the statute's limitation of punishable items and greatly expand the statute's reach. We reverse Defendant's conviction for possession of burglary tools.

### IV. *The Attempting to Take Taser Charge*

Defendant contends the evidence was insufficient to support the conviction for attempting to take an officer's Taser. We conclude substantial evidence supports the jury's guilty verdict.

Section 148, subdivision (b), provides that "[e]very person who, during the commission of any offense described in subdivision (a), removes or takes any weapon, other than a firearm, from the person of, or immediate presence of, a public officer or peace officer" is guilty of a misdemeanor.

At trial, Officer Latinette testified she "felt" and "saw" Defendant grab her Taser and further testified: "Then he went for my gun belt, grabbing my Taser, the top of my Taser and pulling it towards him also causing me to move towards him." When asked about the manner in which Defendant held the Taser, Officer Latinette testified: "He like palmed my Taser and pulled it toward him." The testimony shows Defendant had a firm grasp on the Taser, not merely an incidental touch, as he searched for her gun. Whether Defendant thereafter attempted to find the gun on the officer's gun belt, or had any intent to actually take the gun rather than the Taser, is immaterial. Officer Latinette's testimony supports the jury's verdict.

16

## DISPOSITION

The judgment convicting Defendant of possession of burglary tools is reversed.

The judgment is otherwise affirmed.


McDONALD, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.